### KRONSBEIN v. CITY OF ROCHESTER et al.

·(Supreme Court, Appellate Division, Fourth Department. November 18, 1902.)

1 MUNICIPAL CORPORATIONS—CONTRACTS FOR PUBLIC IMPROVEMENTS—STIPU-
    LATION FOR DEFERRED PAYMENTS—VALIDITY.
        A stipulation in a contract for a local improvement that the city "shall
    not be required or liable to make the aforesaid payments * * * any
    sooner or faster than there shall be money or funds in the treasury prop-
    erly applicable to that purpose, and which shall have been collected or
    paid into said treasury on account of said work or improvement," does
    not invalidate the contract.

·2. SAME—PLEDGING CREDIT OF CITY.
        Such stipulation does not violate Const. art. 8, § 10, which prohibits the
    city from pledging its credit "in aid of any individual, association, or cor-
    poration."

·3. SAME—LIMITATION OF INDEBTEDNESS.
        A contract containing such a stipulation does not impose an indebted-
    ness on the city within Const. art. 8, § 10, which prohibits any city from
    becoming indebted in excess of 10 per centum of its real estate valuation
    app uring by its assessment roll.

·4. SAME—ASSESSABLE REAL ESTATE—WHAT INCLUDED IN—SPECIAL FRANCHISES.
        The special franchises granted by a city pursuant to Laws 1899, c. 712,
    entitled an act "in relation to the taxation of the public franchises as
    real property," are to be considered as a part of its assessable real es-
    tate within Const. art. 8, § 10, which prohibits any city from becoming
    indebted in excess of 10 per centum of its real estate valuation appearing
    by its assessment roll.

5. SAME—AMOUNT OF INDEBTEDNESS—DEDUCTION OF CASH RESOURCES.
        Funds included among the cash resources of a city, and which have been
    set apart pursuant to statutory authority to meet some specific indebt-
    edness against the city, should be deducted from the city's liabilities in
    ascertaining the amount of its indebtedness within Const. art. 8, § 10,
    limiting the amount thereof; but funds on hand not so set apart should
    not be deducted.

·6. SAME—CONTRACT—AWARD TO LOWEST BIDDER.
        A city which had advertised for bids for a pavement to be constructed
    of brick, asphalt, or trap rock was warranted in awarding the contract
    to the lowest bidder for asphalt, though there was a lower bidder for
    trap rock, where at the time of the award there was a petition on file,
    signed by the requisite number of property holders, asking that such
    award be made.

Submission of controversy by Frederick Kronsbein against the city ·of Rochester, and Adolph J. Rodenbeck as mayor thereof. Judgment ordered for defendants.

Argued before McLENNAN, SPRING, WILLIAMS, HISCOCK, :and DAVY, JJ.

Egerton R. Williams, Jr., for plaintiff.
William A. Sutherland, for defendants.

SPRING, J.   There are several questions presented to us for solution in this submitted record.   The city of Rochester contains more than 100,000 population, and is consequently one of the cities of the second class (state constitution, art. 12, § 2), and the plaintiff is a taxpayer to the extent of more than $1,000 upon property in said city, and the defendant Rodenbeck is the mayor thereof.

In May, 1902, the common council of said city passed a final ordinance authorizing the construction of a pavement on Fien street in said city, and the board of contract and supply, pursuant to said ordinance, advertised for bids for the construction of said pavement, to be made either of brick, asphalt, or trap rock.   The lowest bid was for trap-rock pavement, and the next lowest was for asphalt by Whitmore, Rauber & Vicinus, and for the sum of $6,366.   The contract was finally awarded to said bidders of asphalt pavement, and the agreement contained the following clause:

"And it is mutually understood and agreed that the party of the second part shall not be required, or liable, to make the aforesaid payments, or any part thereof, or to pay anything whatever on account of said work, or by virtue of this agreement, any sooner or faster than there shall be money or funds in the treasury of said city properly applicable to that purpose, and which shall have been collected or paid into said treasury on account of said work or improvement."

All the other contracts outstanding for city improvements included a like clause.

The central question involved in this case is whether the city of Rochester, in the award of this bid and in the execution of the contract, exceeded the 10 per centum limitation of indebtedness prescribed by article 8, § 10, of the state constitution.

There are one or two incidental questions, and in a measure connected with the chief subject of the controversy, to which we will first give our attention.

The first and second points in the submitted cases bring up for decision the legality of the agreement as affected by the clause quoted; that is, may the board of contract and supply embody in an agreement with a successful bidder for an authorized local improvement a stipulation by which his pay is to be deferred until collections have been made from the taxpayers applicable to this particular purpose?   While the municipality has control of the city improvements, the expense thereof is to be borne by the property abutting on the particular improvement made or benefited thereby.   The city makes the contract; the property benefited is chargeable with the cost.   The common council may permit the one assessed for a local improvement to pay his taxes in installments.   Section 299, c. 182, Laws 1898.   The burden might become unbearable if the property owner was called upon to pay his taxes for local improvements in one payment; hence the statute permitting its payment in installments.   The city, therefore, has power to make these local improvements to meet the demands consequent upon its growth.   Their cost, however, is not a general burden upon the city.   It is not to go into the general assessment for

the whole city, and still it is not expected to be paid for as soon as the work is completed. The city cannot extend its credit to individuals or to corporations, and with these varying hindrances there seems no other policy open except to oblige the contractor to wait for his compensation until in due course of law those liable to liquidate it have paid the necessary money into the treasury to meet the expenditure. We can see nothing improvident, and certainly no illegal taint, in the agreement to make the payment await the collection of the taxes from the persons responsible in the end for the debt. In People v. City of Syracuse, 144 N. Y. 63, 38 N. E. 1006, the agreement for the construction of a sewer made on behalf of the city contained the provision that no payment accrued to the relator "until the cost of said work shall have been ascertained and assessed upon and collected from the taxpayers liable to local taxation upon the same." It was there held that the relator's remedy was by mandamus to compel the city to collect the tax. The clause did not vitiate the agreement, but, for the benefit of the city and the taxpayer alike, postponed the payment to the contractor until those actually liable could be made to pay by the ordinary mode of procedure prescribed by the statute. In Hunt v. City of Utica, 18 N. Y. 442, and Weston v. City of Syracuse, 158 N. Y. 274, 53 N. E. 12, 43 L. R. A. 678, 70 Am. St. Rep. 472, a similar clause was embodied in the agreement in each instance, and in fact is is quite common whenever local improvements are made in a city, and we do not find that it has received the condemnation of the courts. Nor do we think this clause offends against that part of section 10 of article 8 of the constitution prohibiting the city from pledging its credit "in aid of any individual association or corporation." The agreement in question was made to improve the city, and the mode prescribed by the statute is to levy an assessment upon the owners abutting upon the contemplated improvement; but the city must make the contract and regulate and control the improvement. It is not an intermeddler or a volunteer, but is fulfilling its obligation to itself and to its citizens and property owners in making the agreement. It would be impracticable and strip the common council of its dominion over street improvements if the agreement were to be entered into by the property owners, or if the contractor must look to them for his pay without the intervention of the city authorities. Perforce the statute the city is the intermediary, the agent of the taxpayers, and, in truth, no more than that. The machinery of the city government must be set in motion to raise the tax, but that simply relates to the procedure to be adopted to get the money. We therefore conclude that the agreement was legal and enforceable.

The third question is whether the sum to be paid pursuant to this agreement and other outstanding contracts of like import comprises a part of a city's indebtedness within the compass of article 8, § 10, of the constitution, which prohibits any city becoming indebted in excess of 10 per centum of its real estate valuation appearing by its assessment roll. Is this an indebtedness of the city within the meaning of that prohibition? If this is a debt, the liabilities of the municipality are increased to the amount of it. In fact, this is not true. It is essential that the city keep its streets improved. Liability

for failure to do so frequently adds to the obligations imposed upon it. The statute has committed to it the duty, but, as contiguous property is supposed to reap the pecuniary benefit therefrom; the cost indebtedness is spread upon such property by the assessors. The city must be a party to the contract, but its engagement in effect is to use the power conferred upon it to collect the tax, and the contractor must wait for his pay until the money has been received by the city in due course from the taxpayers. The city protected itself from assuming any liability by the very clause which the plaintiff now contends vitiates the agreement. Give that its intended scope, and the city never will be called upon to pay anything by virtue of this contract. No bond or other evidence of debt is given, and it is not the case of a liability which is fixed upon the city upon the completion of the work, but its date of payment postponed. The fund is to be created for the especial purpose of meeting the contract price of this improvement, so that there can never be any claim which can be enforced against the city, for the contractor relies upon this specific fund. Little v. City of Portland, 26 Or. 235, 37 Pac. 911; Grant v. City of Davenport, 36 Iowa, 396; City of Springfield v. Edwards, 84 Ill. 626. In Tuttle v. Polk, 92 Iowa, 433, 60 N. W. 733, the city had issued its certificates to cover the expense of a street-paving contract, although the cost of the improvement was to be paid by the benefited lot owners. The court, in discussing the effect the transaction had upon the city's debt limit under a similar prohibition to that now under review, say:

"The paving of the streets is one of the purposes for which the city exists, and for which it might have assumed liability, had its debt not reached the constitutional limit; but it guarded against the assuming of any liability, and placed the burden of the improvement upon the owners of property which fronted upon it. That right was given by a statute which was especially designed to authorize the making of such improvements without cost to the city, and we find nothing to prevent giving it full effect. We do not think there is any sufficient reason for holding that the city is in any respect liable for the amounts represented by the certificates, nor that the obligation of the taxpayer is the debt of the city."

If the city should issue warrants to these contractors upon the completion of their paving job payable out of this fund as it was collected from the taxpayers, it would not be repugnant to the constitutional inhibition referred to. Davis v. City of Des Moines, 71 Iowa, 500, 32 N. W. 470; Kelly v. Minneapolis, 63 Minn. 125, 65 N. W. 115, 30 L. R. A. 281; Faulkner v. Seattle, 19 Wash. 320, 53 Pac. 365; City of Lansing v. Van Gorder, 24 Mich. 456. From our examination of this subject we are therefore convinced that where the municipality has the funds on hand to meet the expenses of an improvement made, or has in the ordinary mode of procedure provided by statute authority to raise the money by assessment and tax to meet the particular expenditure, and the compensation is to be paid from that fund, there is no infraction of the constitutional debt limitation, even though the sum to be paid overruns that boundary. We accordingly answer this question in the negative.

The value of the special franchises of the city of Rochester for the year 1901, pursuant to chapter 712, Laws 1899, appears upon the

assessment roll at the sum of $4,399,436. The query we are called upon to solve is whether these franchises are to be considered as part of the assessable real estate of the city in ascertaining the amount of its property upon which the 10 per centum limitation is to be computed. There are two classes of property recognized from time immemorial in the taxing statutes as well as in legal nomenclature, i. e., real and personal. In the statutes prescribing the manner of assessments prior to the enactment of the law providing for the taxing of public franchises (chapter 712, Laws 1899), the assessors were required upon their roll to preserve this distinction. The law referred to was an innovation in that it made assessable property theretofore not within the domain of the assessors. While it provided that the valuation of this particular class of property for taxing purposes should be fixed by the state board of assessors, it still was to go upon the assessment roll of the local assessors. Nor was there any omission to define in unmistakable language to which class of property it should belong. The title of the act, which is significant in determining its meaning, defines it as an amendment "in relation to the taxation of the public franchises as real property." In section 3 occurs the definition of the interchangeable expressions "land," "real estate," and "real property," and it is comprehensive and designed to include these public franchises within its scope. This franchise takes "in all surface, underground or elevated railroads, including the value of all franchises, rights, or permission to construct, maintain or operate the same in, under, above, on or through streets, highways or public places" (section 3). It also embraces "the value of all franchises, rights, authority or permission to construct * * * or operate in, under * * * or through any streets * * * or public places any mains * * * tanks * * * or wires * * * for conducting· water or steam * * * light, gas * * * or other substances, etc." It is, therefore, very clear that the intent of the legislature was to include this property in the general classification known as real estate or land. This franchise is defined in this statute to be a "special franchise," and that it shall "include the value of the tangible property" of the corporation above described, and that such "tangible property * * * shall be taxed as a part of the special franchise." The point is urged that, because of this denomination of the thing to be taxed, the property is not to be treated as real estate. The lawmakers in this important enactment did not carefully, in its title and in the act itself, provide that these franchises were to be assessable as real property and then explode their whole creation by defining the property to be a special franchise. If the legislature should see fit to define what property is to be treated as vacant and what improved, and that each should be separately assessed, the character of the property would not be changed by the definition; and especially would this be true if the legislature circumspectly hedged against any such interpretation by declaring each to be real estate. This new feature in the list of the taxable property must be named, and it must be separately assessed, and not confounded with other property, even of the same general class; and the legis-

78 N.Y.S.—52

lature, by designating what it should be called, certainly did not change its generic quality so carefully defined in the act. Again, it is to be observed that the legislature did no violence to the settled principles of the law in designating these franchises as real property. They are inseparably connected with real estate, and appurtenant to it, like a fixture or an incorporeal hereditament, and the exercise of the privilege requires a disturbance of the soil, of the physical body of the land. The statutory definition runs in harmony with that of the common law. This property when assessed must be placed upon the assessment roll like other property, except that the value of it is fixed by, and the hearing concerning it must be had before, the state board. It therefore conforms to the requirement of the phrase, "real estate as it appeared by the assessment rolls" (section 10, art. 8, state constitution).

We deem it unnecessary to enter into the refined and subtle discussion of the effect of this constitutional provision, as illustrated by the fact that it was passed at one session of the legislature before the passage of the franchise tax law, while the preceding legislature which acted upon it and the vote of the people confirming it was after that enactment. The question at issue can be solved upon more substantial grounds. We are of the opinion, therefore, that the valuation of these franchises is to be taken into account in ascertaining the assessed value of the real estate of the city, for the purpose of determining whether there has been any infringement upon the constitutional interdiction referred to.

Included among the cash resources of the city are several distinct funds aggregating nearly $600,000. The fifth and sixth questions submitted to us for answer are whether these cash resources, or any of them, are to be deducted from the liability of the city in arriving at its indebtedness. These funds are set apart pursuant to statutory authority in each instance, and, as a rule, to meet some lingering specific indebtedness against the city. If this fund is to be used to reduce the principal of a definite existing liability of the city, we think to that extent it should be deducted in estimating the city's liabilities. The outstanding liability toward the payment of which the fund is to be applied in any given case is included among the debts of the city, for the purpose of ascertaining if it has reached its debt limit. The sinking fund, therefore, which is to be used in diminishing it should be credited to the city upon the other side of the ledger. We realize that, when the indebtedness of an individual is mentioned, the sum of his obligations, irrespective of the value of his assets, is intended. The individual may use his assets for any purpose he sees fit. The officials of the city intrusted with the control and application of a fund created for a definite purpose are charged with the duty of using it only for that purpose. A sinking fund invested for the purpose of paying water bonds must not be diverted for the payment of the salaries of officials of the city. It is to be used to reduce that particular debt which it came into existence to deplete, and hence in fact will lessen that liability to the full extent of the fund. If the United States had in its treasury $100,000,000 to be devoted to the payment of certain bonds maturing 10 years hence and representing part of its national debt, in

every statement of the nation's indebtedness the amount would be lessened by said fund, for the reason that it could be used for no other purpose. We must assume this rule will be rigidly adhered to by those committed with the management of the city's finances in disposing of these various funds set apart for specific purposes. We apprehend, however, this construction will not obtain where the cash resources may be used for any legitimate purpose, whether the obligation be already incurred or to be hereafter contracted. To illustrate, there is a fund "among the cash resources denominated the local improvement fund." This money may be used for any local improvements, as there is no restriction upon its application by the municipality. A sum on hand to be devoted to general purposes in that way ought not to be deducted from the liability of the city in estimating its indebtedness, for it may not in fact be used to reduce the same. Therein we conceive lies the distinction.

We do not deem it necessary to go into detail and determine precisely what part of these funds is to be deducted and what part is not to be considered in making the estimate. The general principle we have enunciated can readily be made applicable to any given case whenever the exigency arises for its application, city officials being admonished to heed well the constitutional inhibition if doubt occur at any time. The assessed valuation of the real estate of the city upon the roll for the year 1901, including the special franchises, is $107,303,-311. The aggregate liabilities, without any deduction whatever for cash resources, is $10,787,832.03. It is conceded from this sum should be deducted $100,000 for revenue bonds for taxes overdue within the last five years (section 10, art. 8, state constitution), leaving the liabilities at $10,730,331.10. Ten per centum of the assets stated amount to .$10,730,331.10. Without deducting any other items, the city has not yet reached its debt limit.

It is claimed the award to Whitmore, Rauber & Vicinus was unauthorized, as they were not the lowest bidders for paving, although below anyone for asphalt pavement. When the contract was awarded the said firm there was a petition on file, duly and properly signed by the requisite number of property owners, asking that this award be made. This was ample authority for the action of the board. Its members could not be expected to keep haltered the changing petition signers who on one day desired asphalt pavement, and on another trap rock, and still later returned to their original desire. When the board took action the warrant of authority existed, and that is the test.

The plaintiff is not entitled to judgment restraining the defendant mayor "from signing or executing said contract, or any contract based upon the said award, for the paving of Fien street made by the board of contract and supply to Whitmore, Rauber & Vicinus," but judgment should be awarded for the defendants.

Judgment ordered for defendants. Order to be settled before Mr. Justice SPRING on two days' notice. All concur.