CITY OF EAU CLAIRE, Respondent, vs. EAU CLAIRE WATER COMPANY and another, Appellants.

*December 17, 1908—January 26, 1909.*

*Arbitration and award: Conclusiveness of award: Validity of award: Presumptions: Setting aside: Questions submitted: Power of arbitrators: Evidence: Witnesses: Impeachment of award: Admissibility of testimony of arbitrators: Values: Municipal corporations: Acquiring waterworks plant: Ordinancecontracts: Notice to assignees of owner of franchise: Waiver: Tender: Indebtedness of municipalities: Constitutional limit: Offsets: Vendor and purchaser: Failure to convey: Rights and duties of vendor and vendee as to profits and interest.*

1. Where the written award of arbitrators is directly responsive to the one question submitted, What is the value of a waterworks plant? and declares that the arbitrators have ascertained and fixed the value of such property, upon its face the award is as final and conclusive between the parties as the

judgment of any other tribunal having jurisdiction to decide such question, not excepting a court of law or equity.

2. Every presumption is in favor of such an award, and its invalidity must be shown, by any one asserting it, by clear and satisfactory evidence.

3. On an arbitration, all questions of judgment within the submission are concluded by the decision of the arbitrators, and are not subject to appeal and review by the court.

4. Under a submission to arbitration of the single question, What is the value of a waterworks plant? the arbitrators have plenary power to decide questions of admissibility, competency, and weight of evidence.

5. Arbitrators are competent witnesses before themselves, are not excluded from the use of their own expert knowledge, and are not confined to testimony from witnesses under oath.

6. The testimony of arbitrators as to what transpired in the hearing and deliberation will not be received to impeach their award.

7. The question of value is illusive, and a fact that may be controlling and significant with reference to one class of property, or under certain circumstances, sinks into comparative insignificance under others, and every element or consideration varies in its influence according to the judgment and experience of the person who is to decide on a value as between buyer and seller; hence it is improper to permit an attack upon an award of arbitrators upon an intricate question of value by attempting to review their mental processes as imperfectly disclosed by them on cross-examination.

8. On review of an award by arbitrators to whom was submitted the single question of the value of a waterworks plant, under the evidence, stated in the opinion, it is *held* that no such glaring undervaluation was shown as to convict the arbitrators of arbitrary or fraudulent action.

9. In proceedings by a city to exercise a right to acquire a waterworks plant owned and operated under an ordinance-contract granting the franchise therefor, which provided, in case the city should exercise a reserved option to purchase, that all assigns of the original grantee should be effectively notified by giving notice to the chief officer in charge of the waterworks, the contract provision is *held* reasonable and notice so served binding on all claiming an interest under the original grantee.

10. In such case, on an arbitration as to values, a mere lienholder is not entitled to notice of the daily hearings before the arbitrators, but in view of the record, if such notice was neces-

sary, it is *held* to have been waived, as well as any defect in the preliminaries to the selection of the arbitrators.

11. A contract-ordinance, whereby a city granted a water company the right to construct a waterworks system, is *held* to be reasonable and not open to the objection that it cannot be specifically enforced because the city therein reserved the right to purchase, without a corresponding right in the water company to enforce a sale.

12. An ordinance-contract providing for the method of a city's acquiring a waterworks plant required that, to the extent of any outstanding bonds, the purchase price should be paid to the trustees for such bonds, otherwise the payment to be made to the holder of the title. The required amount was tendered to the holder of the title, through its officers in the state, accompanied by merely a request that a release of a recorded mortgage be secured, the city having no means of knowledge as to the amount of indebtedness secured by the mortgage. Then, for the first time, the city received information, binding upon the water company, that the amount of the indebtedness exceeded the purchase price, and consequently that the whole purchase price was by the terms of the ordinance-contract payable to the trustee in the mortgage. *Held*, that an actual, manual tender thereafter made to the trustee was sufficient.

[13. Where an ordinance-contract provided that the municipality could take over a waterworks plant from the water company to which the franchise for its construction and maintenance was granted, on the payment of a valuation fixed under the provision of such ordinance-contract, whether the water company can raise objection that the amount of the valuation so fixed brought the indebtedness of the municipality above the constitutional limit of five per cent. on its assessed valuation, when the actual money was in the possession of the municipality and was tendered to the water company and its mortgagee, not decided.]

14. In determining whether the amount of the indebtedness of a municipality will exceed the constitutional limitation of five per cent. on its assessed valuation, the following items are *held* proper offsets to its present or prospective amount of indebtedness: (1) a sinking fund accumulated against outstanding municipal bonds; (2) the amount of the general fund then in the treasury; (3) a credit fund consisting of certain special assessments for pavements, sewers, and sidewalks, levied in definite amounts upon specific parcels of property, drawing interest, although payable in annual instalments.

[15. Whether sums which had been contributed by subscribers for proposed nonliability bonds to be issued upon the security of such waterworks after the same should be acquired can be considered as an asset in reduction of such constitutional limit, not determined.]

16. Where one who is under a legal duty to convey property to another, wrongfully, though in good faith, refuses to do so, a court of equity will treat the property as belonging to the grantee after the time at which it ought to have been transferred, and will treat the wrongdoer as a trustee thereof for the purchaser's benefit, liable to account at least for the profits actually received.

17. In such case, if the grantee has enjoyed the use of the purchase money, or, indeed, has by his act deprived the grantor of such use, the grantor's duty to account for profits should be abated to that extent.

18. In such case, where the purchase money has been tendered, and has been so appropriated to the purposes of the tender that the purchaser has received no benefit therefrom meanwhile, and the failure of the seller to receive it and enjoy its use is due wholly to his own fault, the loss of interest which such money might have earned if put to use should not fall upon the purchaser.

19. Where a municipality, after having made an actual and manual tender of money on its indebtedness, sets apart and appropriates the money to the debt, and places it in the hands of its treasurer as a special fund which the debtor can receive at any time, it is such compliance with the rules governing tender as to be effective to stop interest.

APPEAL from a judgment of the circuit court for Eau Claire county: A. J. VINJE, Judge. *Affirmed.*

The city of *Eau Claire,* in preparation for establishing municipal waterworks, had acquired certain real estate and other property, together with easements and privileges, including a right to water power for the purpose of operating pumps delivered to it at its water wheels. In 1885 it entered into an ordinance-contract with Fairbanks, Morse & Co., whereby a franchise was granted to operate waterworks and charge certain rates to private consumers, the city agreeing to pay a specified hydrant rental. The city turned over to Fairbanks, Morse & Co. its said property, easements, and rights, inclu-

sive of the contract for power, and the latter contracted to build and maintain waterworks under various specifications. That ordinance or contract contained the following:

"This ordinance is passed upon the express condition and reservation that the city of *Eau Claire* reserve to itself the right to acquire of the said grantees, their heirs and assigns, the said waterworks, and all lands, machinery, pipes, mains, hydrants and appurtenances thereto belonging, and the said grantees, their heirs and assigns, in accepting this ordinance, expressly covenant and agree that they will sell and convey to the city of *Eau Claire* the said waterworks and all lands, machinery, pipes, mains, hydrants and appurtenances thereto belonging, or in any manner appertaining thereto, at the expiration of five years from the completion of said works and at intervals of five years thereafter at an appraised value for said works to be determined as follows:

"Whenever the city shall determine or desire to purchase said works, the mayor thereof shall give written notice to said grantees, their heirs and assigns, of the intention of the city to purchase and demand of the said grantees, their heirs and assigns, to appoint and select two persons to act as arbitrators in fixing and appraising the value of such waterworks without taking into consideration the property and rights leased or hereinbefore granted by the said city to the said grantees, their heirs and assigns, by this ordinance, or any hydrants and connections which may have been located on said main pipes at the expense of the city, which said notice may be served upon any one of the said grantees, their heirs and assigns, or upon the chief officer in charge of the said waterworks at *Eau Claire*. . . .

"Said five persons, or their majority, at a meeting of which all said arbitrators shall have had personal notice, may and shall, as arbitrators, on examination and evidence, fix and terminate the actual value of the said waterworks, exclusive of the property and rights leased or hereinbefore granted by the said city to the said grantees, their heirs and assigns, by the second section of this ordinance, and without reference to the franchise therewith connected, but including all improvements, buildings, betterments, machinery or other appliances placed by the said grantees, their heirs and assigns,

upon or connected with the property so leased or granted to them by the said city, and constituting a part of the said waterworks, excepting the hydrants which may have been located on the said main pipes at the expense of said city at the time such appraisal is made, such appraisal not to exceed what it would cost to build and construct such works at that time. And said appraisers shall make their award in writing in duplicate; and shall deliver one duplicate to the said grantees, their heirs and assigns, or to the chief officer in charge of the said waterworks at *Eau Claire,* and shall file the other with the city clerk of the said city within ten days after the same is made."

The city was then to have the option to purchase at such appraisal. Waterworks were constructed by Fairbanks, Morse & Co. and assignee corporation, the Eau Claire Waterworks Company, or by its receiver appointed in certain foreclosure proceedings. In 1903, upon receiver's sale, the entire system, with all rights existing, was sold, and about July 10th of that year transferred to the defendant the *Eau Claire Water Company,* which, at about the same time, executed a mortgage to the defendant *Farmers Loan & Trust Company* to secure a permitted issue of $350,000 of bonds, the amount of which issue is not determined by any evidence except a statement by an officer of the defendant water company that it exceeded $300,000, and that at least $20,000 worth were held by the water company. In 1895 an appraisal was had, upon which the city elected not to purchase. In 1900, at the end of another five-year period, the subject of purchase was submitted to a referendum, and a resolution adopted to call for appraisal under the contract, and a notice of such election and appointment of appraisers was attempted to be given to all interested as assigns of Fairbanks, Morse & Co. by delivery of such notice to the secretary and superintendent of the water company, who resided at *Eau Claire* and was the only officer of either of the defendant companies in Wisconsin and who was in active charge and management of the waterworks business and plant. Five arbitrators were ap-

pointed in the contract method, two by the city, two by the water company, and a fifth by the circuit judge. They filed an award in which they appraised the property at $253,000. The city made tender of that sum both to the superintendent and secretary of the water company and to the defendant *Farmers Loan & Trust Company* and demanded conveyance and release of the mortgage, which being refused, this action was commenced to compel specific performance of that part of the ordinance-contract agreeing to so convey. Upon the trial a large amount of evidence was offered with reference to the manner of procedure of the board of appraisers. The court found that they proceeded, pursuant to said ordinance and in the manner therein provided, to ascertain and determine the value of said system of waterworks; that they did fix it upon examination and evidence, acting together in all things as a board; that they did not act arbitrarily or in an unreasonable or unlawful manner; did not except or omit to take into consideration any of the items of the property which should have been considered, and fixed the value of said waterworks as of the date when said award was made at $253,000. The court also found the fact of demand and tender and that the city had kept a sum of the tender on hand in its treasury in a separate fund until the commencement of this action, when, on March 5, 1907, it paid the same to the clerk of the court, where it still remains; whereupon judgment was rendered requiring the defendants to make proper conveyance and release, and to accept said $253,000, except that the plaintiff should recover from the defendants the net revenues derived from the waterworks in the interval between the time of tender and the judgment, and should also recover one half of the total fees of the fifth arbitrator paid by it, which, under the contract, were to be paid one half by each party; from which judgment the defendants appeal.

For the appellants there were briefs by *W. F. Bailey,* attorney for *Eau Claire Water Company,* by *Winkler, Flan-*

*ders, Bottum & Fawsett,* attorneys for *Farmers Loan & Trust Company,* and by *F. C. Winkler,* counsel for both appellants; and the cause was argued orally by *Mr. Bailey* and *Mr. Winkler.*

*A. C. Larson,* attorney, and *James Wickham,* of counsel, for the respondent.

DODGE, J.    1. The submission to arbitrators in the present case was simply and solely to decide the one question, viz., What was the value of the entire waterworks plant, excepting those elements thereof derived from the city? The written award is directly responsive to this submission, and declares that the arbitrators have ascertained and fixed the value of such property, excepting only that which the contract directs shall be excepted, at the sum of $253,000. Upon its face, therefore, this award is final and conclusive between the parties as the judgment of any other tribunal having jurisdiction to decide such question, not excepting a court of law or equity.    Every presumption is in its favor, and its invalidity must be shown, by any one asserting it, by clear and satisfactory evidence.    *Wood v. Treleven,* 74 Wis. 577, 43 N. W. 488; *Consolidated W. P. Co. v. Nash,* 109 Wis. 490, 503, 85 N. W. 485; *McCord v. Flynn,* 111 Wis. 78, 89, 86 N. W. 668; *Jacobs v. Queen Ins. Co.* 123 Wis. 608, 613, 101 N. W. 1090; *White Star M. Co. v. Hultberg,* 220 Ill. 578, 77 N. E. 327.    All questions of judgment within the submission were concluded by the decision of the arbitrators.    They were not subject to appeal or review by the court, and yet the appellants introduced before the court evidence taken by the arbitrators and also additional evidence tending to show a different and higher value.    It was sought to have reviewed the question whether conflicting evidence before the board on various questions constituted a preponderance for or against certain decisions or opinions which one or another of the arbitrators expressed upon de-

tail elements of value, upon which, of course, the board only passed incidentally in reaching its final decision on the one question submitted to it as above stated. While the trial court allowed such testimony to be put in, there is of course no necessary presumption that he gave weight to it in reaching his decision, and we comment upon it merely to indicate the apparently erroneous view of the grounds on which and the manner in which a solemn award upon arbitration can be attacked which was entertained, or at least urged, by appellants' attorneys. The question whether, in the light of all the evidence before it, the board rendered a wrong award fraudulently, arbitrarily, and by mistake, or even in antagonism to the preponderance of evidence, it would seem must be resolved in the negative, for the reason that it does not appear that there was before the circuit court all the evidence upon which the arbitrators acted; not even all the sworn testimony. It is in evidence, as support for whatever findings the court has made, that in a session of some thirty days the arbitrators spent about ten days sitting in an office and hearing testimony and statements; that about an equal time was spent by them in examining in detail the property and various records and documents, and that the remaining period was occupied by general computations, examination of evidence, and discussions and arguments before the board by counsel and by the individual arbitrators. It is made apparent that at all the sessions of the board, both in the office and in the field, statements of facts were continually made, principally by the representatives of the water company, but also by others, notably by members of the board, two of whom were experienced engineers, presumably experts upon many of the subjects worthy of consideration. Under this submission the board had plenary power to decide questions of admissibility, competency, and weight of evidence. *McCord v. Flynn,* 111 Wis. 78, 86 N. W. 668; *Boston W. P. Co. v. Gray,* 6 Met. 131; *Campbell v. Western,*

3 Paige, 124; *Phaneuf v. Cory,* 190 Mass. 237, 76 N. E. 718; *Roberts Bros. v. Consumers C. Co.* 102 Md. 362, 62 Atl. 585. The arbitrators themselves were competent witnesses before the board. *Graham v. Graham,* 9 Pa. St. 254. They were not excluded from the use of their expert knowledge, which may have been the very reason inducing their selection. 2 Am. & Eng. Ency. of Law (2d ed.) 657, note 3; 3 Cyc. 648; *Cobb v. Dolphin Mfg. Co.* 108 N. Y. 463, 15 N. E. 438. The board were not confined to testimony from witnesses under oath. *Kane v. Fond du Lac,* 40 Wis. 495, 501; 3 Cyc. 642; 2 Am. & Eng. Ency. of Law (2d ed.) 660. If, however, we pass over this seemingly insuperable obstacle to any finding by the court that the evidence before the arbitrators did not support their conclusion and consider all of the evidence offered by the appellants, a large part of which was inadmissible and incompetent under the firmly established rule that the testimony of arbitrators as to what transpired in the hearing and deliberation will not be received to impeach their award (*Bigelow v. Maynard,* 4 Cush. 317; *King v. Jemison,* 33 Ala. 499; *Stone v. Atwood,* 28 Ill. 30; 2 Am. & Eng. Ency. of Law (2d ed.) 705, note 1), we still fail to find any such clear preponderance of evidence of misconduct or even of error in the arbitrators as to justify us in repudiating the finding of the trial court. When we look at the evidence offered in court of misconduct, it is almost entirely directed to an assumed position of the board upon a question not involved in its award, which counsel seem to think might under certain contingencies fall within its duty to decide. That was the question of the cost of reconstruction of a new plant, which they construed not to be an identical plant, but one equally as efficient for the required purposes. The testimony is that, for this purpose, they made up from the inventory a list of those things which would need to be constructed by one putting in a new plant at the time of the arbitration. It is asserted that they ex-

cluded from this list many things which the water company had which had cost considerable sums and which, the water company argued, were elements of value in its plant. The answer to this contention was of course obvious, that, while elements of value in the existing plant if it were to be sold, they might yet be such structures as no reasonable man would duplicate in erecting a new plant. Many of them had been constructed for purposes which had been found futile and had been abandoned for the objects for which originally constructed, although some of them had been made to serve other purposes which could just as well have been accomplished at less expense. Again, elements which were included in this estimate of cost of construction, it is claimed, were included therein at prices so far below the probable cost thereof as to constitute an arbitrary and fraudulent decision. Notably this was urged with reference to the weight of underground pipe which would be required for an equivalent pipe system, the cost of such pipe and the cost of laying it. The answer to all this class of testimony, however, is that there is no showing that it affected the award in fact made. Indeed, it is shown affirmatively that it was argued and conceded by the board that, in considering its award of the value, they should include an estimate of all enhancement of that value resulting from those things which had been eliminated in the estimate of what a new plant would cost, and the court upon such evidence has found that the arbitrators so acted. It is argued by appellants, however, that when it is shown that the arbitrators adopted a grossly inadequate price for pipe or for the laying thereof it must be assumed that in their mental processes in reaching the conclusion of value they were guided by a previous conclusion as to cost of doing such work anew at the date of the arbitration. This we think is a *non sequitur.* The quantity of pipe in the ground laid through a period of twenty years is not necessarily to be valued as of the cost of laying that pipe at any particular moment, with a

deduction for the deterioration thereof. One purchasing such a system of works would not contemplate any momentary renewal of such pipe. Doubtless, as the years went by, renewal of the pipe would have to take place, but he would contemplate no such exigency with regard to it that it must be done at a period of the highest price either for material or labor. We do not, however, mean to suggest that the board was without evidence from which they might have determined, even as a step in reaching their award, that the figures used by them in estimating cost of reconstruction would be those fairly to be expected in the event of such reconstruction. Whether they decided correctly or not, is not relevant to the validity of their award.

There is one item which in the light of the argument stands somewhat differently from the others, and that is the flume whereby the water is conducted from the mill pond to the wheels of the pumping station erected by the water company. It was excluded from the list of articles which would be necessary in case of reconstruction of the plant, and one arbitrator was allowed, probably improperly, to testify that he did not allow anything on that item in making up his mind as to the value of the plant. The question before the arbitrators, and again presented to the trial court, was whether this flume was one of the items of property received from the city for which the respondent was not to pay and which the arbitrators were not to take into account. This was a question both of construction of the contract and of evidence. The contract transferred to the company a certain duty on the part of the Dells Improvement Company, the owner of the water power, to supply power for pumping, which it had assumed in a contract with the city, and that contract bound said owner to put in water wheels for power for the city and furnish to said city for waterworks purposes at the place where such wheels are located sufficient water for the efficient operation of said waterworks, which it was claimed bound the

Dells Improvement Company to construct the necessary flume or aqueduct to transport the water. The evidence on the part of the defendant was that it constructed said flume, but in pursuance of an agreement with the Dells Improvement Company whereby the latter paid it compensation for doing said work. Assuming, though we do not think it proved, that the board decided on these facts that this flume was not part of the property to be included in its appraisal, we think the evidence is sufficient to justify that conclusion and also the inferential finding of the court to the same effect.

It is urged that the arbitrators proceeded arbitrarily in fixing value and did not pursue a proper method. All that is shown, if indeed it is shown by admissible evidence, is that after some thirty days of conference and examination, argument, and reflection, a motion was made by one arbitrator to fix $240,000, which motion was lost, and after some further argument a motion was made to fix $253,000 and was adopted by a majority vote. Various theories for valuation of such a plant are suggested by appellants' counsel, and many more might be, all having support from either economic or judicial writers. It is enough to say of this contention that the evidence fails to show that any of the elements of value were omitted from consideration or failed of their due weight in producing the result. The question of value is illusive, and a fact that may be controlling and significant with reference to one class of property or under certain circumstances sinks into comparative insignificance under others, and every element or consideration varies in its influence according to the judgment and experience of the person who is to decide on a value as between buyer and seller. In *Chicago, B. & Q. R. Co. v. Babcock*, 204 U. S. 585, 27 Sup. Ct. 326, the subject is interestingly discussed and the absurdity pointed out of attacking or permitting an attack upon an award of appraisers upon an intricate question of value by attempting to review their mental processes as imperfectly disclosed by them upon

cross-examination.    It is there said and is equally applicable here:

"Evidently, also, the members or some of them used their own judgment and their own knowledge, of which they could give no very good account on cross-examination, but which they had a right to use, if honest, however inarticulate the premises."

And again:

"But the action does not appear to have been arbitrary, except in a sense in which many honest and sensible judgments are so.    They express an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions; impressions which may lie beneath consciousness without losing their worth."

Other recent cases of interest are *Wilcox v. Consol. Gas Co.* 212 U. S. 19, 29 Sup. Ct. 192, and *Knoxville v. Knoxville W. Co.* 212 U. S. 1, 29 Sup. Ct. 148.    There is no element of value suggested by counsel which there is not evidence to show was considered and judgment passed upon its weight by some members of the board, and in that respect the finding of the trial court must conclude further discussion.

It is further urged that the evidence discloses a real value so far in excess of that found by the arbitrators as to convict them of unreason and arbitrary procedure.    We cannot at all agree with this contention.    The items of evidence principally relied on are, first, the construction account of the company, showing an expenditure through a period of some twenty-one years of approximately $440,000; secondly, an award of certain arbitrators in 1895 of $272,000, with a subsequent expenditure in construction of some $60,000; and thirdly, the accounts of revenue and expenditure, showing in the last year, as claimed, $25,000 of net revenue.    Each of these is subject to very obvious possible discredit.    For example, in the alleged expenditure of $440,000 were contained many things which had proved to be futile and useless, or

nearly so, and of little or no actual value to a proposed purchaser of the waterworks plant; also that there had been included, through the years, items which were in whole or in part only replacement of wornout and outgrown appliances. These considerations were proper for the board of arbitrators upon examination alone of the works and of the charges. The fact of another arbitration, with no evidence as to the manner in which it was conducted, and which was never accepted or carried into effect by the parties, was hardly evidentiary. At best, it was the opinion of certain men which could at the utmost only have advisory effect on the minds of the arbitrators. The third item of income is one which may be cogent under some circumstances and of little significance under others. The board could see at a glance that the amount of $25,000 was far in excess of any income which could fairly be expected in permanency from that plant which they were to value. Every man of common sense knows that the plant which furnishes the power to run the pumps for such a waterworks is a very important part thereof, and that power was all furnished by the city and was to be excluded in the purchase of the works. If the net earnings of the defendant's plant and of the city's water power was, in combination, $25,000, demonstrably the net revenues of the water company's plant were something less. It would require neither a philosopher nor an expert to discover fallacy in the contention that, because a wagon with a team of horses earned $100 a year in excess of expenses, the wagon had a value of $1,600. Further, it was made to appear that the element of deterioration in the material parts of the plant had not been deducted in ascertaining this balance of revenue; also that some expenditures for what was properly repair had been diverted into construction account and therefore not deducted; and it was also in evidence that some thousands of dollars of expense for salaries in conducting the business of the water company had also been omitted. It matters

not whether there was evidence to accurately establish the amount of these imperfections in the so-called earnings account. They were obvious and glaring enough to justify an honest-minded arbitrator in declining to be controlled by the rule of thumb that because the books showed $25,000 of net earnings therefore the plant must be worth over $400,000. Again, the question as to probability of continuance of such earnings was proper for consideration. Against these three principal items of evidence the arbitrators had before them the fact that these same works had been sold in open market, together with the franchises and property interests granted by the city, for $225,000 some three years before the arbitration, and that the subsequent expenditures in additions thereto had been some $20,000. They also had the sworn testimony of the secretary and superintendent, given shortly before the arbitration, that they could reconstruct the works fully for $210,000. In the light of all such evidence we are unable to think that any such glaring undervaluation is shown as would be necessary to force us to a belief in arbitrary and fraudulent action by the appraisers.

2. It is urged, especially by the trust company appellant, that no sufficient notice was given to it before the appointment of arbitrators. We need not discuss the sufficiency as notice of a service upon the person in charge of the property, were a party's rights to be affected thereby *in invitum* and without his consent. It suffices for this objection to point out that all parties had acquired their rights in this property and their liens thereon under and by virtue of a contract which provided that all assigns of the original interest of Fairbanks, Morse & Co. should be effectively and sufficiently notified by a delivery of the notice to such person. They had thus contracted that such service should constitute notice to them. They had made that contract upon abundant consideration, and we cannot consider it otherwise than reasonable, in view of the inability of the city to know with certainty the per-

sonnel or whereabouts of the assigns, and the necessity for a high public purpose, that the city should be able to take the necessary steps to acquire ownership and control of these waterworks if the welfare of the community demanded it.

Nor can we discover any reason to deem this arbitration invalid because of absence of notice to the trust company of the daily hearings before the arbitrators. The rights of the trust company were entirely derivative from and dependent on those of the water company; it had no ownership in the property, but merely a lien thereon, and it obviously could have exercised no control over the conduct of the arbitration or the personnel of the arbitrators. This view seems to be fully declared in *Chandos v. Am. F. Ins. Co.* 84 Wis. 184, 54 N. W. 390.

Further than this, however, we think it plain that, in the light of the answer of defendant trust company and a colloquy between counsel in the course of the trial, defendants waived any defect that may exist in the preliminaries to the making up of the board of arbitration. It was said, and we think assented to by the counsel of the trust company: "We haven't on this trial or will we make any question as to the regularity of the proceedings up to the time of arbitration. We admit that they were entitled to the arbitration and that the arbitration was had." *Non constat,* if this assurance had not been given to plaintiff's counsel, it might have been shown by evidence that the trust company was in fact informed and notified of all the proceedings and participated therein through the defendant water company.

3. It is next urged that the contract in question is unconscionable, because one-sided and giving the right of purchase to one party without any corresponding right in the other to enforce sale, and that a court of equity should decline to enforce it. The objection might have much force as between two individuals in parity with each other. This contract, however, must be viewed in the light of the purposes sought

to be accomplished and of the peculiar character of the property and of the parties, especially the proposed purchaser, a municipal corporation. As such it has the care of high and important considerations of public welfare. The protection of its community from fire perils, from threats to the public health, and from excessive charges or inadequate supply of one of the necessities of daily existence are amongst the highest of the duties imposed upon municipalities in this state. For the accomplishment of this purpose the legislature has declared a public policy that cities should have the power to acquire and own waterworks—whether wisely or not is not a judicial question. In cities where waterworks are privately owned that public policy can be carried into practical effect only by the purchase of the existing works, and a contract which goes only so far as to make possible such a purchase cannot be deemed unreasonable or unconscionable, though the same contract between private individuals might be. The municipality must act through several different branches of its government. The legislative branch must pass upon policy, and in so doing must consider multitudinous questions of finance, some of which are answerable only after the price is ascertained. The legislative and executive branches of government may then unavoidably be called into action to provide the means of paying that price, and only after these steps and perhaps many others have been found possible and advisable, have been decided on and have been taken, can the city, through its executive, act effectively in making a purchase. The individual, on the other hand, can both decide and act at once. We see no more in the option provisions of this contract than are reasonably necessary to a fair opportunity for the municipality to take the steps which are necessary to an intelligent consideration by either the electorate at large or the legislative representatives thereof to decide upon the possibility and advisability of purchase after a price is ascertained, and to provide the means to carry into effect that

decision.   Any unusual burdens cast upon the seller thereby are compensated and offset by the burdens resting on the purchaser in performing an important function of government imposed upon it.   Besides, they have been compensated by a grant of rights and privileges which none but a governmental agency could confer upon them, and which serves to substantially differentiate the situation from a similar contract for purchase between two individuals acting *sui juris*. The contract has been so far performed by the city that the streets are occupied and other rights held by the water company at least practically obstructive of the city's right and duty to furnish general water supply.   These rights and privileges have been conferred on the faith of this contract for purchase.   The *status quo* can be re-established and the city placed in its former situation only in case conveyance be compelled.   In other words, equity cannot be done, and the rights of the city and the public cannot be protected, except by compelling performance of that promise by which defendants obtained and enjoyed the franchises it now holds.   Such considerations have induced courts unhesitatingly to specifically enforce similar contracts.   *Farmington V. Corp. v. Farmington W. Co.* 93 Me. 192, 44 Atl. 609; *Bristol v. Bristol & W. W. W.* 19 R. I. 413, 34 Atl. 359; *Schroeder v. Gemeinder,* 10 Nev. 355; *Herrman v. Babcock,* 103 Ind. 461, 3 N. E. 142; *Johnston v. Trippe,* 33 Fed. 530; *Joy v. St. Louis,* 138 U. S. 1, 11 Sup. Ct. 243; 6 Pom. Eq. Jur. (3d ed.) § 773.

4. Some complaint is made as to the sufficiency of the tender of the purchase price fixed by the arbitration.   We can see no defect therein.   The ordinance-contract required that, to the extent of any outstanding bonds, purchase price should be paid to the trustees for said bonds, otherwise the payment must be to the holder of the title.   The required amount was tendered to the holder of the title, accompanied by merely a condition that a release of the mortgage be pro-

cured. The city had no means of knowledge what amount of indebtedness was secured by the existing mortgage. The tender was made to the secretary and superintendent of the corporation, the only officer thereof in the state of Wisconsin. It was undoubtedly a tender to that corporation. Then, for the first time, the city received information, binding upon the water company, that the amount of that indebtedness exceeded the amount of the purchase price, whereby it learned that the whole amount of such purchase price was by the terms of the ordinance-contract payable to the trustee in the mortgage. It accordingly made actual, manual tender of said amount to such trustee. The money has been kept ready for the defendants ever since: First, by a deposit as a separate fund in a public treasury, and later by deposit in court; thus, undoubtedly, has the tender been kept good. *Mankel v. Belscamper,* 84 Wis. 218, 54 N. W. 500; *Appleton v. Appleton W. W. Co.* 136 Wis. 395, 117 N. W. 816.

An item of $1,227 for laying certain extensions after the arbitration was commenced did not need to be included either in the amount of the award or the amount of the tender. It was payable upon a separate and distinct contract whereby the water company agreed to do the work and the city to pay the cost thereof in the event that the works were purchased in pursuance of the arbitration, and an order had been duly issued therefor whereby that amount of money, which was at all times in the city treasury, became appropriated to the defendants. *Appleton v. Appleton W. W. Co., supra.*

5. Further, it is contended that the city could not by tender or otherwise obligate itself to pay the $253,000 of award at the time it decided to purchase the works and made the tender, for the reason that thereby the indebtedness of the city would be brought to excess above the constitutional limit of five per cent. on its assessed valuation. Laying to one side the question whether the defendants could raise any such objection when the actual money was in the possession of the

city and was tendered to them, we think that the premise upon which the objection is founded is not established. The court found that an addition of $253,000 to the debts then existing would not bring the total to an excess over the five per cent. In reaching this conclusion of fact the court decided that certain items of city assets were proper offsets or deductions from either its present or prospective amount of indebtedness. The first of these was the amount of the sinking fund accumulated against outstanding city bonds; the second was the amount of the general fund then in the treasury; the third was a credit fund consisting of certain special assessments, for pavement, sewers, and sidewalks, to be more fully described hereafter; and the fourth was a sum of $68,000 which had been contributed by subscribers for proposed nonliability bonds to be issued upon the security of the waterworks after the same should be acquired. The financial statement makes apparent that if either all the first three classes of assets or the fourth item were proper offsets against the indebtedness, the city could incur the additional $253,000 without exceeding its five per cent. limit. As to the sinking fund, it is confessedly and by all authority a proper offset against the existing bonds to payment of which it is pledged. *Rice v. Milwaukee,* 100 Wis. 516, 520, 76 N. W. 341; *Kronsbein v. Rochester,* 76 App. Div. 494, 78 N. Y. Supp. 813. The money in the general fund is also, it seems almost too clearly for debate, a proper practical offset against indebtedness. The council might have used such fund momentarily to pay off any item of indebtedness or to pay for the waterworks. This view seems to be sustained by *Rice v. Milwaukee,* 100 Wis. 516, 76 N. W. 341, where a general fund, except so far as specifically pledged, was so treated. Even if we accept the somewhat limited view that possession of assets does not diminish existing debts, still the necessity of incurring new and further debt in making an anticipated purchase is obviated

and diminished by possession of money with which to pay
the purchase price.    The purchase of the waterworks is only
illegal if and because the city will *ex necessitate* thereby be-
come indebted for such additional amount as will bring the
total debts above the five per cent. limit.    If it has $60,000
which it can pay in cash upon the purchase, its debt is in-
creased not $253,000, but only $193,000.    Hence the money
in hand is effective in that way to avert the predicament
which it is claimed would render void the purchase.    That
money in hand for general city purposes might be so used,.
seems to us clear.    Provision of water supply is a legitimate
city purpose, as much as cleaning or lighting streets, for
which such a fund may be used in absence of charter restric-
tion.    *Ellinwood v. Reedsburg,* 91 Wis. 131, 64 N. W. 885;.
*Appleton W. W. Co. v. Appleton,* 116 Wis. 363, 374, 93 N.
W. 262.

The special assessment certificates present one additional
question.    The city is empowered to cause certain street im-
provements to be made and the expense to be levied as a spe-
cial assessment on the abutting lots.    It may pay for the
work itself or may let contracts whereby the contractors take
their pay in the special assessment certificates.    *Eau Claire*
took the former method, paid for the work out of the general
fund, levied definite amounts upon specific parcels of prop-
erty, issued certificates therefor, and now holds such certifi-
cates in process of collection, which, by law, is accomplished
by including such assessment in the tax carried out against
the respective parcels, either in one sum or in instalments of
one fifth in each of five years.    Of course the money when
collected returns to the general fund in replacement of
money paid therefrom for the expense of the improvement.
The certificates, or, if extended, the improvement bonds,
draw six per cent. interest, and are, the court finds, readily
salable for their face.    Such money, when collected into the
general fund, is obviously controlled by the considerations

with reference to that fund itself already expressed. We can see no escape from the view that so much of the money due on those certificates, not actually collected, as is potentially within reach for general city expenses is equally within that fund, and, like it, available in offsetting existing indebtedness or averting necessity for new indebtedness for anything purchasable out of the general fund. The question when prospective revenues are so potentially in hand that they may be counted against the contracted expenditures has often been considered by this court. *Earles v. Wells,* 94 Wis. 285, 68 N. W. 964; *Crogster v. Bayfield,* 99 Wis. 1, 7, 11, 74 N. W. 635, 77 N. W. 167; *Rice v. Milwaukee,* 100 Wis. 516, 76 N. W. 341; *Herman v. Oconto,* 110 Wis. 660, 670, 86 N. W. 681; *Balch v. Beach,* 119 Wis. 77, 82, 95 N. W. 132.

In *Earles v. Wells* it is said that "a municipality's capacity for doing business on such cash basis, with outstanding liabilities, is necessarily measured by the amount of cash on hand and the available assets and resources readily convertible into cash to meet the payment of such liabilities as they become due;" and states the antithetical condition as "with no money nor assets in the treasury, nor current revenues collected or in process of collection for the payment of the same." In *Crogster v. Bayfield* the first above quoted words were assumed to correctly state the law, and apparently a quantity of tax certificates owned by the county were held available as a credit to the extent of their sale value, although of course the only method of collection was by the sale of the property, purchase thereof by the county, and maintaining the lien thereon for future payment. In *Rice v. Milwaukee* were considered prospective fees for liquor licenses and upon taxation or license of the street railroad, depending on its earnings, and payable five months later than the date under consideration, and they were rejected for the reason that they were "entirely indefinite and uncertain. They

were not in process of collection, and could be collected only at the will of parties who sought privileges for which license charges were made, and for that reason could not be considered as available assets or resources." The court further defined potential assets as only such "as the corporation had levied, and had a legal right to enforce, regardless of any one's will or pleasure. The 'available assets and resources' referred to means tangible property in the treasury legally available and properly applicable to the payment of debts and readily convertible into money for that purpose." In *Herman v. Oconto* was under consideration the city's condition in October, and the annual taxes which had been decided to include in the tax roll were held not proper assets or revenues in process of immediate collection, because they had not yet been levied; that not until "the proper tax roll was put in the collector's hands and the tax was then enforceable regardless of the will of the taxpayer" could the taxes be considered assets. *Balch v. Beach* was to the same effect. In the instant case all of the conditions prescribed in these several decisions seem to be satisfied. The amount of the special assessments had been levied, they were in course of the process of enforced collection, and were not subject to or conditioned upon the volition of anybody. The question of doubt is whether a process of collection which under the law may be protracted as to a part through a period of four years is a process of immediate collection, as such word is used in some of the cases. This expression was used to exclude a condition where no levy and right to commence collection existed. In any event *Crogster v. Bayfield* seems to be authority for the conclusion that, at least to the extent for which such liens duly levied upon specific real estate can be sold by the city, they constitute a present available asset for the purpose of paying debts to which they are applicable. There is no evidence as to what proportion of this $30,000 of special assessments there had been steps taken to extend

them over the permissive five-year term; but we think that immaterial, for the reason that, if so extended, the city was at liberty to issue improvement bonds in place of them, which would draw interest, which might be sold, or which might be an entirely legitimate investment for the moneys in the sinking fund. Such improvement bonds, in the light of the charter, would not constitute an indebtedness of the city, as counsel asserts on the authority of *Fowler v. Superior,* 85 Wis. 411, 54 N. W. 800. The authority of that case has been strictly limited to the issue of bonds then under consideration. *Uncas Nat. Bank v. Superior,* 115 Wis. 340, 349, 91 N. W. 1004; *Chase v. Superior,* 134 Wis. 225, 114 N. W. 437.

We therefore conclude that it was not made to appear that the purchase of the waterworks in question for $253,000 would necessitate the incurring of an indebtedness which, added to the existing debt, would exceed the constitutional limit of five per cent. upon the assessed valuation. We express no opinion, therefore, as to whether the $68,000 mentioned above, paid into the city treasury as subscription for prospective nonliability bonds, could be considered an asset in reduction of indebtedness.

6. Error is assigned upon the accounting, not because the defendants were required to account for the net revenues earned by the works since the tender, and credit the same to the plaintiff—the correctness of which seems to be conceded,—but upon the failure to offset against the same interest on the purchase price from the time of its tender. The rule seems to be, generally, that when one who is under a legal duty to convey property to another, wrongfully, though in good faith, refuses to do so, a court of equity will treat the property as belonging to the grantee after the time at which it ought to have been transferred, and will treat the wrongful holder as a trustee thereof for the purchaser's benefit, liable to account at least for profits actually received.

*Benson v. Cutler,* 53 Wis. 107, 10 N. W. 82; *S. C.* 66 Wis. 305, 28 N. W. 134; *Bostwick v. Beach,* 103 N. Y. 414, 423, 9 N. E. 41; *S. C.* 105 N. Y. 661, 12 N. E. 32; Fry, Spec. Perf. (3d ed.) §§ 1372–1375. Obviously, however, if the grantee has enjoyed the use of the purchase money, or, indeed, has by his act deprived the grantor of it, the very equities of the case would demand that the latter's duty to account for profits be abated to that extent; but where the purchase money has been tendered, and has been so appropriated to the purposes of the tender that the purchaser has received no benefit therefrom meanwhile, and the failure of the seller to receive it and enjoy its use is due wholly to his own fault, no very good reason is apparent why the loss of interest which such money might have earned if put to use should fall on the innocent purchaser. The authorities are generally to that effect. Fry, Spec. Perf. (3d ed.) § 1383; Waterman, Spec. Perf. § 519; *Bostwick v. Beach, supra; Davis v. Parker,* 14 Allen, 94; *Eastman v. Simpson,* 139 Mass. 348, 1 N. E. 346. In the present case it appears that the amount of the tender has been, through all of the period of litigation, strictly set apart and appropriated, as, indeed, it needed to be in case at any moment the defendants should change their attitude and tender conveyance. True, it may not have been put out of the control of the defendants, but it was kept in the hands of the city treasurer, an officer of the law, whose duty it was by law to pay it over to the defendants when they complied with the legal requirements. When a municipal corporation thus sets aside and appropriates money to a debt, and places it with an officer of the law as a special fund which the debtor can receive at any time, it is at least such tender as is effective to stop interest. *Appleton W. W. Co. v. Appleton,* 136 Wis. 395, 117 N. W. 816. The record is barren of any evidence that the city did receive any interest upon this fund, and we certainly cannot take judicial notice that there was any opportunity for it by reasonable diligence to

have done so. Such a fund, liable to be withdrawn any moment, would be an embarrassment rather than an advantage to any bank likely to be found in a city of the size of *Eau Claire,* and therefore not likely to invite compensation for its deposit even at a low rate of interest. We cannot think any error was committed in refusing to offset interest upon this fund against the profits realized by the defendants from the use of the waterworks, which they should have conveyed to the plaintiff at the time of the tender.

We find no error which need reverse the conclusion of the circuit court.

*By the Court.*—Judgment affirmed.