### PETER FORTUNE

*v.*

### BAYARD STOCKTON *et al.*

*Opinion filed October 19, 1899—Rehearing denied December 9, 1899.*

1. PRINCIPAL AND AGENT—*power to collect is not implied in power to loan.* It cannot be inferred, in the absence of such usage, that an agent to loan money is empowered to collect it.

2. SAME—*when party paying debt to trustee is chargeable with notice of his want of power to receive payment.* One who pays to the trustee named in a trust deed the debt secured thereby, which he is not authorized to receive, and takes from him a release but does not obtain the notes, which are not in the trustee's possession, is chargeable with notice of the trustee's want of power to receive payment.

3. SAME—*when charges against agent do not make principal responsible for his subsequent acts.* Charges against an agent do not make the principal responsible for a subsequent act of the agent beyond the scope of his actual or implied authority, and in a transaction other than that concerning which complaint was made.

4. PAYMENT—*when payees of notes secured by trust deed are not bound by payment to trustee.* The payees of notes secured by a trust deed are not bound by payment to the trustee before maturity, in reliance upon his false representations, when he had neither actual nor implied authority to receive it, although he released the trust deed, where the notes were not surrendered but remained in the hands of the payees, who had no knowledge of the payment.

*Stockton* v. *Fortune,* 82 Ill. App. 272, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. E. F. DUNNE, Judge, presiding.

FREDERICK S. BAKER, (STILLMAN & MARTYN, of counsel,) for appellant:

A principal will be bound by payment to his agent before maturity, if, from the course of dealing between them or from the facts of the particular transaction, it can reasonably be inferred it was intended the agent has authority to receive such payment,—and this whether the agent has possession of the note or not. Mechem on Agency, sec. 796; Story on Agency, (9th ed.) sec. 172; *Thompson* v. *Elliott*, 73 Ill. 221; *Mason* v. *Bauman*, 62 id. 81; *Insurance Co.* v. *Maguire*, 51 id. 350.

It has been held in cases exactly parallel to the case at bar, that the agent in each case was the general agent of the mortgagee to accept payments of principal and interest upon loans negotiated by such agent, and that the mortgage debts were fully discharged by payments made to the agent. *Security Co.* v. *Christy*, 33 Fed. Rep. 22; *Security Co.* v. *Richardson*, id. 16; *Kent* v. *Congdon*, id. 228.

Where a non-resident client and principal has for many years sanctioned the practice of the public in going to his attorney for information about matters in charge of such attorney and agent, such client and principal will be bound by the representations of such attorney and agent as to matters peculiarly in his charge, whether such representations be true or false. *Willard* v. *Buckingham*, 36 Conn. 395; *Lobdell* v. *Baker*, 1 Metc. (Mass.) 201; *Johnson* v. *Barber*, 5 Gilm. 430; Mechem on Agency, sec. 717; Story on Agency, (9th ed.) sec. 138; Wharton on Agency, sec. 158.

Where a principal deals through another acting as his agent and representative, and, after information of such agent's previous dishonesty and fraudulent acts in the

conduct of such business, (which dishonesty and fraudu-
lent acts are not generally known,) continues to permit
such agent to act for him, then such principal is guilty
of negligence, and in case of loss through the act of such
agent, acting within the apparent or declared scope of
his authority, such negligent principal, and not the in-
nocent party so dealing with such agent, must be the
loser.    Estoppel is a question of ethics.    *Railroad Co.* v.
*Schuyler,* 34 N. Y. 59; *Dezell* v. *Odell,* 3 Hill, 225; *Scott* v.
*Magloughlin,* 133 Ill. 35.

MONTGOMERY & HART, (HATCH & RITSHER, of counsel,)
for appellees:

Possession of the securities is, in the absence of actual
authority or a known course of dealing, indispensable
evidence of authority to receive the principal of the debt.
*Stiger* v. *Bent,* 111 Ill. 328.

Authority of an agent to receive interest or principal
on a mortgage cannot be inferred from the fact that the
agent had collected and paid over to the mortgagee in-
terest on other mortgages.    From authority to collect the
interest upon a mortgage authority to collect the princi-
pal cannot be inferred, where the agent is not in posses-
sion of the securities.    Dunlap's Paley on Agency, 274.

Before the maturity of the securities, even possession
of them is, in the absence of actual authority or a known
course of dealing, insufficient evidence of authority to
receive payment.    *Thompson* v. *Elliott,* 73 Ill. 221; *Smith* v.
*Kidd,* 68 N. Y. 130; *Bagnell* v. *Walker,* 46 S. W. Rep. 126.

Payment before maturity involves an alteration of the
original contract.    *Railway Co.* v. *Wiggins,* 46 S. W. Rep. 731.

A release of a trust deed by the trustee, when the
note thereby secured has not been paid to the owner of
it and such owner has not authorized it, has no effect,
as between the parties or subsequent purchasers with
notice.    *Insurance Co.* v. *Eldredge,* 102 U. S. 545; *Stiger* v.
*Bent,* 111 Ill. 328.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

On April 2, 1887, Emma A. Leahy (now Emma A. Elliot) executed her note for $5500, payable March 1, 1890, to appellees, Bayard Stockton and LeRoy H. Anderson, trustees for the children of Sarah J. Conover, with interest payable semi-annually, and secured the same by a trust deed to Isaac E. Adams, trustee, on a lot in Chicago. Afterward, on October 1, 1888, she executed another note for $4500, payable five years after date, to the same parties, with interest payable semi-annually, and secured the same by a trust deed to the same trustee on substantially the same property. The notes were for money borrowed, and Isaac E. Adams negotiated the loans and sent the notes to appellees. Said Isaac E. Adams held a general power of attorney from her dated May 26, 1885, and on November 22, 1889, before the maturity of either of the notes, she contracted in writing, by her said agent, to sell said premises to the appellant, Peter Fortune. She made and acknowledged her warranty deed November 30, 1889, conveying the premises to Fortune. On December 2, 1889, Adams, as trustee, executed releases of the trust deed and Fortune paid to Adams the amount of the indebtedness thereby secured, but the notes were not in the hands of Adams and were not surrendered. The conveyance and releases were filed for record December 3, 1889. The payment to Adams was without the knowledge of the payees, Stockton and Anderson, and the notes remained in their hands, and Adams paid the semi-annual interest as it matured for about three years after he had released the trust deed, when default was made in such payment, and the bill was filed in this case September 11, 1893, to foreclose the trust deed. The answers of Emma A. Elliot, Greenville P. Elliot and Peter Fortune set up the payment in full of the notes to the trustee as a defense to the foreclosure, and alleged his authority, as

agent, to receive such payment. Other defendants answered with a general denial of the allegations of the bill. The cause was referred to a master in chancery to take the testimony and report the same with his conclusions. He reported that the evidence did not show any authority on the part of Adams to receive the payment or execute the releases, and he recommended a decree of foreclosure in accordance with the prayer of the bill. The defendant, Peter Fortune, excepted to the report, and on a hearing the court sustained his exceptions and dismissed the bill for want of equity, at the cost of complainants. On appeal to the Appellate Court that court reversed the decree and remanded the cause, with directions to enter a decree in conformity with the report and recommendation of the master in chancery.

The question in the case is whether the payment made to Adams was a payment to the complainants. The just rule of the law is, that a person shall not be bound by the act of another who assumes to act for him and in his behalf, where he has neither authorized the assumed agent to do the act nor conferred apparent authority upon him. Where one assumes to act for another, that fact is notice to those who deal with him that there must be a delegation of authority from the principal, and they are bound to ascertain its existence and extent. In ascertaining such authority of the agent a third person may rely upon the apparent authority which the alleged principal holds the agent out as having, because to permit the principal to repudiate the authority in such a case would be to enable him to commit a fraud on other parties. In this case there was no authority conferred upon Adams to receive payment, either expressly or by implication. The complainants did not intend to, and did not, delegate to him such authority. Adams was a lawyer living in Chicago, and he wrote to complainants several letters proposing to make loans of trust funds in their hands upon the security of Chicago real estate. On De-

cember 24, 1886, complainant Stockton wrote to Adams, agreeing to take a loan so proposed and outlining the method of doing the business. Adams replied by telegram and letter, and under the arrangement entered into twenty-six loans were made from 1886 to 1893. The arrangement was that Adams would procure applications for loans and forward them to complainants, who would determine whether they would accept the loans. Adams was to furnish an appraisement of the value of the property. If the loan was accepted Adams was to procure the necessary papers to be executed and forward them, except the one that would have to be recorded, together with his opinion of the title, and a draft for the amount of the loan at one day's sight. When that was done they would accept the draft or forward a draft for the money. After the trust deed was recorded he would send that, and complainants in all cases held the securities. When interest matured Adams usually received the money from the borrower and remitted it to complainants, who then sent the coupon to be surrendered, and sometimes complainants sent to Adams coupons that were due, for collection. In a few instances borrowers desired to pay off the loans before maturity. In these cases Adams wrote to complainants for their consent, and if they were willing, the original papers and abstract were sent to him, with instructions. In this case Adams wrote to complainants October 10, 1889, as follows: "Mrs. Leahy has been made an offer for her property and buyer desires to pay cash. I have stated that without your consent I have no power to release, but that I would lay the matter before you." Complainants replied: "We would prefer not to release the Leahy mortgage, unless our action would be productive of real, substantial loss to her." Adams had a partner, Hamilton, and the answer was in the firm name, as follows: "We will refer your answer to Mrs. Leahy." On November 20, 1889, Adams again wrote: "Have you the abstracts for the Leahy loan, corner Wood and Madi-

son streets? If so, will you please forward the same immediately? Mrs. Leahy will probably sell the property. As to taking up the loans existing on the same, we tried to arrange to let them lie, but we cannot yet state." He further said they had two or three very good applications for loans, which they would hold in case it should become necessary to take the money if complainants should desire to place it there, as well as some other money that was coming in. On November 22, 1889, complainants sent the Leahy abstract by express, and wrote saying they hoped Adams could arrange to have the loans remain without change. The next day Adams again wrote that Mrs. Leahy was obliged to request a clearance of the loans, and saying, "Mrs. Leahy will pay interest to date of re-investment, and I have assured her, in the light of your last favor on this subject, that I thought you would consent to release, though you did not like to do it." On November 30, 1889, Adams wrote about other applications, saying that he would advise complainants the first of the next week how the money had better be divided up, and concluding: "At the same time I will give you date when Leahy money will be ready for your order, and ask you at that time to forward note, trust deed, etc., in your possession."

Now, it is evident from these letters that the complainants were willing, under the circumstances, to receive payment before the maturity of the notes and to re-invest the money with other funds, and expected to send the notes and trust deeds to Adams, with directions, whenever the transaction was ready to be closed, but they never sent the securities nor gave the authority and were not called upon to do so. Adams got a check payable to his own order and converted the money to his own use without the knowledge of complainants. The understanding, and the only understanding, was that Adams would look over other applications and decide which it was best to accept, and if the sale by Mrs. Leahy was

effected, would send for the notes. After the trust deeds had been released he wrote complainants, December 5, 1889: "I will want the Leahy papers early next week, and will send you further word." On January 2, 1890, Adams represented that the Leahy matter was still pending, and on January 9, 1890, wrote: "The Leahy matter has·been delayed by sickness of one of the parties, and may be for some time." Afterward he forwarded the interest from time to time as it became due. Adams had never received payment of loans and executed releases without the securities, and there was no implied authority to make the collection in that way. In every one of the loans complainants had the notes before they advanced the money loaned, and in no case did they authorize or permit Adams to collect the principal debt, except as they sent.him the security. In one instance complainants sent the security to Adams to receive the money and there was long delay in receiving the remittance, in consequence of which, on September 23, 1888, Stockton wrote him with reference to a payment of a mortgage to be made by Proudfoot, that the application for the new loan to take its place ought to be sent to complainants and the new mortgage drawn, and the notes, abstracts, etc., sent to them before they surrendered the mortgage.

The evidence does not show any appearance of authority in Adams to receive the payment and release the trust deeds. It is not claimed that there was any usage or custom of the business from which Fortune or Mrs. Leahy could have inferred that Adams had power to make the collection. An agent employed to negotiate a contract does not have, as an incident thereto, authority to receive payment, and in the absence of such usage it cannot be inferred that Adams was empowered to collect the money because he was agent to loan it. (*Thompson* v. *Elliott*, 73 Ill. 221.) It is practically the universal custom to take up and cancel notes when they are paid, and for one who is authorized to collect, to have possession of the notes

and be able to surrender them. Adams did not have possession of these notes, and we think it has uniformly been considered, under like circumstances, that there is no appearance of authority to make the collection. Where an agent has possession of a note that is due, it may be inferred that he has authority to receive payment of it, but such an authority could not be inferred from that fact in a case like this, where the paper was not due. Where a trustee releases a trust deed and receives payment of the debt without actual authority and without producing the securities, the party paying has notice of the want of power in the trustee. (*Cooley* v. *Willard*, 34 Ill. 68; *Stiger* v. *Bent*, 111 id. 328.) The inference of authority to receive payment arising from the possession of the securities is founded upon such possession, and it does not exist without possession. 1 Am. & Eng. Ency. of Law, (2d ed.) 1026.

Not only was there no appearance of authority, but Fortune did not rely upon any. Adams made the contract of sale as attorney in fact for Mrs. Leahy, and William J. English was attorney for Fortune. The business was closed up at the office of Fortune's brewery, in Chicago. English inquired for the notes, and Adams answered that he was pressed with business and was going away; that he had made a search in his office for them but they were mislaid; that he had looked for them several days before, and that he wrote to complainants asking them to send them if they had them; that he supposed they would be there on the afternoon mail; that he would send them over or have his partner, Hamilton, do so; that he had purchased his ticket and sleeper to Boston that night, and that his wife was outside the office in a carriage waiting for him; that he was pretty sure the notes were in his office, but mislaid; that he was jointly interested with the complainants, and they owed him quite a large amount of money, and he was really the owner of the money. Fortune asked English what he thought about

it, and he replied that he knew Adams as a reputable lawyer, apparently well off and standing high socially, and that he himself should take his chances on it. Fortune concluded to do so, and made his check payable to the order of Adams, relying on his assertions. This shows clearly that Fortune did not rely upon anything that complainants did, but upon Adams' false statement that he had authority and that he was the equitable owner of the notes. Fortune was not only guilty of negligence in that respect, but he made no inquiry afterward for the notes during a considerable period of time, when Adams was responsible and when no person would probably have suffered if investigation had been made. It was the obvious dictate of common sense and ordinary prudence to have obtained the securities, or at least to have made inquiry when they were not sent as agreed. Instead of following such a course, he left the securities uncanceled and unpaid in the hands of the payees for years.

It appears that Charles D. Seeberger, who had been a very intimate friend of Adams and had quarreled with him, made charges against him to Stockton and Anderson in 1888, and it is argued that they should have withdrawn the agency from Adams on account of said charges, and that by failing to do so they have become responsible for his wrong. Seeberger's disclosures had nothing to do with this transaction, and complainants cannot be held responsible for an act which they neither authorized, nor gave the public or any person reason to suppose they had authorized, on account of anything Seeberger had told them.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*