# CASES DETERMINED

AT THE

# January Term, 1917.

CONNELL, Trustee, Appellant, vs. CITY OF KAUKAUNA and another, imp., Respondents.

*August 15, 1916—January 16, 1917.*

*Public utilities: Indeterminate permit: Effect of acceptance: Acquirement of plant by city: Waiver of verdict of necessity: "Purchase:" Condemnation: Eminent domain: Validity of statute and of proceedings: Notice to lienholders: Actual notice: Corporations under same management: Trustee under trust deed: Declaring bonds due: Default in interest: Negotiable instruments: Authority to accept payment: Burden of proof: Condemnation of mortgaged property: Payment of award: Rights of bondholders: Waiver: Election of remedies: Laches: Estoppel.*

1. The acceptance, by a public utility, of an indeterminate permit under sec. 1797*m*—78, Stats. (Laws 1907, ch. 499), amounted to a perpetual waiver of a verdict of necessity, as required by sec. 2, art. XI, Const., and a consent that proceedings to acquire its property might be initiated at any time by the municipality and that its property might be acquired in the particular manner prescribed by the act.

2. A proceeding by a city to acquire the property of a public utility under sub. 4, sec. 1797*m*—79, Stats. (Laws 1907, ch. 499), though denominated a purchase and although in some aspects the rights of the parties were contractual, was in the nature of a condemnation proceeding and its effect is to be determined in accordance with the laws governing the exercise of the power of eminent domain.

3. Such a proceeding may be sustained as one in the nature of a condemnation proceeding, although the statute did not require that notice be given to the holders of liens upon the property to be acquired; and it was not essential to the validity of the statute that it should contain such requirement. *Davis v. La C. & M. R. Co.* 12 Wis. 16, and other cases, distinguished and limited.

4. Formal notice of such a proceeding to the trustee under a trust deed of the property to be acquired is sufficient to bind the holders of the bonds secured by such deed.

[5. Whether the public character of the hearing before the railroad commission, provided for in sec. 1797$m$—82, Stats. (Laws 1907, ch. 499), together with the right of review given to bondholders, etc., by sec. 1797$m$—83, as amended by ch. 662, Laws 1911, constituted sufficient notice to bind all bondholders by the determination of the commission, is not determined.]

6. In such a proceeding, formal notice of the hearing before the railroad commission was given to the utility but not to a trust company to which a trust deed of the property, securing bonds, had been given. The president and managing officer of the trust company, who was also the owner or in control of practically all the capital stock of the utility, directed the prosecution of an appeal from the order of the commission. Although he was not an officer of the utility, the attorneys who acted under his direction entered their appearance in its behalf. *Held* that, since the trust company and the utility were not separate in interest and were under the same management and control, the trust company, and through it the bondholders, had actual notice of the proceeding and were bound by the judgment affirming the award of the commission.

7. Under a trust deed providing that in case of a default in payment of interest on the secured bonds the principal thereof should, at the election of the trustee, become immediately due and payable, there was no such default where the trustee advanced the money and paid the interest to the bondholders, even if it did so to conceal from them the true situation; and in any event the principal would not become due, because of a default as to interest, until the trustee in fact so elected.

8. The mere fact that bonds and interest coupons thereon were payable when due at the office of a trust company which was trustee in the trust deed securing the bonds, did not make such trustee the agent of the bondholders to receive payment.

9. Payment of a negotiable instrument must be made to the person having possession of the same or to some person duly authorized to accept payment; and where payment is made to a person not in possession of the instrument the burden is upon the payor to show the authority of such person by clear and satisfactory evidence.

10. The authority of a trustee under a trust deed to act for the holders of the bonds secured thereby is prescribed and limited by the terms of the deed; and a payment to the trustee cannot be held

Connell v. Kaukauna, 164 Wis. 471.

to be a payment to the bondholders unless made when and as prescribed in the deed.

11. The lien of a mortgage extends to the award made in proceedings for condemnation of the mortgaged property.

12. A city which had notice of a trust deed of the property of a public utility which it was acquiring by condemnation, was bound to see that the amount of the award (which was less than the amount of the bonds secured by said deed) was applied to the satisfaction of the claims of the bondholders; and it could not discharge that obligation by turning the money over to the utility corporation, then insolvent.

13. Where a trust company to which a trust deed securing bonds had been given was the general agent, for investment purposes, of some of the bondholders, with power to accept payment of their bonds, the receipt by such trust company, even before maturity of the bonds, of a part of the award made upon condemnation by a city of the property covered by said trust deed, constituted a payment to said bondholders of their share of the award to the extent of their *pro rata* share of the sum so received; but as to other bondholders, for whom the trust company was not such agent, the receipt of the money by it was not a payment and did not affect their right to their *pro rata* share of the award.

14. The trust deed in such case being for the *pro rata* benefit of all bondholders, and the award being less than the amount of the outstanding bonds, each bondholder became entitled to receive his *pro rata* share thereof.

15. Where in such case, after the trustee named in the trust deed had received the greater part of the award prior to the maturity of the bonds and had so misapplied it that as to some of the bondholders there had been no payment, the successor of such trustee demanded from the city the balance remaining after satisfying a prior lien from a part of the award retained by the city for that purpose, such demand did not constitute an election of remedies or a waiver of any other rights which such successor might assert as representative of the bondholders whose claim to the award had not been satisfied.

16. Nor was such successor trustee barred by laches or estopped from claiming a foreclosure of the trust deed on behalf of said bondholders—who had no actual notice of the condemnation proceeding at the time of the payment, before the bonds were due, to the original trustee—by the fact that, after they became chargeable with notice of the facts by reason of default in the payment of their interest, they permitted the city, without objection or notice of adverse claim, to expend a large sum in betterments of the property.

APPEAL from a judgment of the circuit court for Fond du Lac county: CHESTER A. FOWLER, Circuit Judge. *Reversed.*

The action is one to foreclose a trust mortgage, executed by the defendant Kaukauna Gas, Electric Light & Power Company (hereinafter designated the Kaukauna Company) and the defendant *Citizens Savings & Trust Company* (hereinafter called the *Trust Company*). The facts in this case are practically undisputed, and are briefly and succinctly stated in the findings of the circuit court as follows:

"1. That the Kaukauna Gas, Electric Light & Power Company, on April 10, 1906, being then duly organized as a Wisconsin corporation, duly executed the certain trust deed described and set forth in the complaint, and on said day duly executed and delivered to the trustee named therein the $75,000 first mortgage bonds described and in terms as set forth in the complaint, which trust deed was forthwith duly recorded in the register of deeds' office of Outagamie county.

"2. That the trustee named in said deed was the Citizens Trust Company, a trust company organized under the laws of Wisconsin, and in taking said bonds it credited the said Kaukauna Company with the full face value thereof and charged the said company with the amount of $78,340.73, which was the amount theretofore owing to it by the Kaukauna Electric Light Company, which transferred the plant and property covered by said trust deed to said Kaukauna Gas, Electric Light & Power Company in consideration for $51,000 stock in the new company, the $75,000 first mortgage bonds in suit, and $30,000 second mortgage bonds of the said new company. And that there was no other consideration or payment for said $75,000 bonds than as aforesaid.

"3. That the said defendant Kaukauna Company never had sufficient revenue to pay its running expenses and the interest on said $75,000 mortgage bonds. That it turned over to the Citizens Company, the trustee named in said deed, its entire revenues after paying current expenses. That the said Citizens Company, at interest-paying times, charged the said Kaukauna Company upon its books with the full amount of the interest on said $75,000 bonds, and itself paid the interest coupons when presented by the holders or credited the

accounts and pass-books of its customers who held said bonds with the amount of the interest ·thereon.

"4. That the said Citizens Company transferred said bonds in suit to various of its customers upon receiving from them money with direction to invest the same for them in safe interest-bearing securities. That said customers were not informed by the Citizens Company, prior to or at the time of the transfer, of the nature or name of the securities that would be or were being purchased with such money.

"5. That the property covered by said trust deed was at the time of the execution of said deed not worth to exceed $50,000 and that seventy-five per cent. of the face value of said $75,000 bonds was never paid to or received by said Kaukauna Company therefor.

"6. That the franchise to operate said plant in the city of *Kaukauna* as an electric light and power plant expired by its terms in 1904, and that at the time said bonds were issued the company had no franchise or right to operate said plant in *Kaukauna* except at the mere will or sufferance of the city of *Kaukauna.* That in 1908 the defendant Kaukauna Company duly took an indeterminate franchise under the Public Utilities Law of the state. That the trustee named in said trust deed, or the holders of said bonds, never in express terms consented to the taking of said indeterminate franchise, but the said trustee at all times knew of the taking thereof.

"7. That on December 27, 1910, the defendant city of *Kaukauna* duly determined to purchase said plant under the said Public Utilities Law and took due proceedings to that end by duly notifying the railroad commission and said company of its said determination. That thereupon the said commission, in accordance with the terms of said Public Utilities Law, duly notified the defendant city and the defendant Kaukauna Company of the time and place of hearings and proceeded in due course to determine the value of said plant. That no notice of its determination to purchase said plant was ever given by the city to the bondholders and no formal notice was ever given by it to said trustee, but the said trustee in fact knew of said determination and of all proceedings had before said railroad commission and never made any objection thereto or intervened therein or sought hearing therein other than was given to said Kaukauna Company and

said city. That said railroad commission never gave to said trustee or said bondholders or any thereof notice of said proceedings before it or of any hearings therein. That said railroad commission in all things duly proceeded according to the terms of said Public Utilities Law as the same at the time stood, to determine the value of said plant, and on December 29, 1911, determined the value thereof to be $50,000, and directed the payment of said sum by said city to said Kaukauna Company and the transfer of said plant by said company to said city.

"8. That on January 2, 1912, the said city took possession of said plant and has ever since remained in possession and control thereof and has received all the revenues therefrom, and has claimed to be the absolute owner thereof free from the lien of the said trust deed, all to the knowledge of said trustee ever since the transfer.

"9. That on July 11, 1912, the defendant city paid to the defendant Kaukauna Company the said sum of $50,000, with interest thereon to date of payment and the value of supplies turned over to the city by said company not included in said $50,000 award, less the sum of $6,500 retained by said city, pursuant to stipulation with said Kaukauna Company, to secure the defendant city against a claim of the Green Bay & Mississippi Canal Company in litigation claimed by said canal company to be superior to the lien of said trust deed, the total amount paid on said day to said Kaukauna Company being the sum of $45,294.40. That said city paid said money in the expectation and on the understanding that the Kaukauna Company would pay the same over to the trustee for the benefit of the holders of said $75,000 bonds and that the said trustee would hold and pay the same to the said bondholders *pro rata* according to their holdings; and that the city entertained the opinion, in good faith, that the said trustee was managing and for a long time had been managing the said plant and applying its revenues for the benefit of the bondholders, and understood that it was in reality and in fact paying the same into the hands of the trustee.

"10. That said Kaukauna Company on said July 11th deposited said $45,294.40 paid to it as aforesaid with said Citizens Trust Company, the trustee under said trust deed, and said Citizens Company held the same until the 19th day

of July, upon and after which it applied and paid out the
same as directed by said Kaukauna Company as follows:
some $20,000 to itself to repay itself for interest on bonds ad-
vanced to said Kaukauna Company; some $7,000 to itself to
repay itself for so-called first lien improvement bonds by it
taken, issued to provide for betterments to the plant ordered by
the railroad commission in service proceedings instituted by
the city of *Kaukauna;* and some $15,500 to favored bondhold-
ers, the face and interest on bonds of said $75,000 issue held
by them; and the remainder to diverse general creditors of
said Kaukauna Company.

"11. That no action was taken in the course of said pur-
chase proceeding to take the verdict of a jury as to the neces-
sity of the taking of said plant by the city.

"12. That the Citizens Company had full knowledge when
it transferred said bonds to said bondholders that the same
were issued for less than seventy-five per cent. of the face
value thereof, but that the holders to whom it transferred the
same had no knowledge or notice of such fact and purchased
the same for value before maturity.

"13. That the said bondholders received no interest on
their said bonds on November 1, 1912, and then learned of
the said purchase proceedings by the city, that the said
purchase price had been paid, and that the city had been in
possession of said property since the previous January under
claim and belief in good faith that it had the absolute title
thereto free from the lien of said trust deed, and that it had
made considerable and was making and was about to make
extensive and costly improvements in said plant; that the
city made said improvements on the understanding and be-
lief that the bondholders acquiesced and were acquiescing in
its said claim, and that said bondholders did acquiesce there-
in until the 24th day of July, 1914, when the present trustee
first notified the city that he claimed the lien of said trust
deed was still in force and that he had right to sell said prop-
erty under foreclosure to satisfy the same. That the cost of
the improvements thus made by the city approximated
$30,000, and the greater part thereof were made between
April 1, 1912, and July 24, 1914.

"14. That the present trustee was appointed to succeed
said Citizens Trust Company as trustee on May 12, 1914, and

that on May 27th thereafter he formally and after deliberate consideration demanded of the defendant city that it pay to him for the bondholders the residue of said $6,500 held by it to protect itself against the lien which was adjudged prior to that of said trust deed, and that the city now has in its hands the sum of $2,084.85, the residue of said $6,500 retained as aforesaid.

"15. That the Kaukauna Company duly began an action in the circuit court for Dane county to review the determination of the railroad commission fixing the value of the said plant and said case was pending until September 2, 1914, when the said determination was affirmed.

"16. That the bonds of said issue outstanding and unpaid aggregate the sum of $59,500, with interest thereon since May 1, 1912, and that they are held as follows: . . ."

The facts in relation to the connection of James M. and Thomas J. Pereles with the transaction detailed in the findings are not set out in the findings although shown by the undisputed evidence. It appears that on April 10, 1906, the Kaukauna Electric Light Company resolved to sell its plant to the Kaukauna Company. The stockholders of the vendor company were the president and secretary and treasurer of the *Trust Company*. The price by the offer was $156,000, to be paid by the issue of 510 shares of $100 each of the stock of the Kaukauna Company, and $75,000 of its first and $30,000 of its second mortgage bonds. The offer was on the same day accepted and the 510 shares issued, one share to James M. Pereles and one share to Thomas J. Pereles, and one to W. W. Allis, and 507 to A. R. Coates. But by an assignment dated April 9, 1906, Coates transferred the 507 shares to James M. and Thomas J. Pereles; so that from the beginning they owned all but one share of the stock. James M. and Thomas J. Pereles were at once made president and secretary and treasurer of the Kaukauna Company, and were at the same time president and vice-president of the *Trust Company* and owned over five sixths of its stock and dominated and controlled both companies then and dur-

ing all the time covered by the findings in this case. The by-laws of each company authorized its president to carry on the business of the corporation and manage the same, and the vice-president to co-operate with the president. April 10, 1906, the stockholders and directors of the Kaukauna Company resolved to accept the offer of the Kaukauna Electric Light Company and that the stock and bonds be issued; that the bonds be secured by trust deeds to the *Trust Company;* that the deeds and bonds be such as the *Trust Company* should require, and that the $75,000 of first mortgage bonds be delivered to James M. and Thomas J. Pereles and that $30,000 of second mortgage bonds be delivered to W. W. Allis. On the same day the trust deed in suit was made to secure the $75,000 of bonds and another to secure the $30,000 of second mortgage bonds. On April 10, 1906, Coates owed the *Trust Company* $31,863.35, and the vendor owed the *Trust Company* $46,477.38. Thereupon the *Trust Company* opened an account with the Kaukauna Company, charged it with said debts, $78,340.73, and credited it with $75,000 of bonds. May 2, 1906, such bonds were delivered to James M. and Thomas J. Pereles, but they were dated April 10, 1906, treated as then issued, and many of them sold between such dates. Many customers of the *Trust Company* left money with it to invest, with authority to care for and protect the loans and security while they ran. It kept a deposit account with each customer, and in his pass-book was entered the deposits and the amount paid for securities and all interest paid. It thus invested between April 10, 1906, and 1912 the deposits and balances of various customers in the $75,000 issue of bonds. It appears that some of the customers authorized the Pereles firm and the *Trust Company* to make, continue, care for, and protect their investments, leaving the bonds in the custody of the *Trust Company* with very general powers in respect to them; while other customers had the custody of their bonds and cared for

or looked after the investments themselves. To secure and protect such investments, James M. Pereles and Thomas J. Pereles, owning substantially all of the stock of the Kaukauna Company, managed it, either personally or through a representative, they at all times retaining a substantial control.

The law firm of Nathan Pereles & Sons consisted of James M. Pereles and Thomas J. Pereles. Its offices and those of the *Trust Company* joined on the main floor of the Pereles Building in Milwaukee. The main office of the Kaukauna Company was in the rooms of that firm and therein the corporate meetings of that company and of the *Trust Company* were held. On June 28, 1908, James M. and Thomas J. Pereles, through their representative in charge of the Kaukauna Company, directed the company to surrender its franchise and take an indeterminate permit.

James M. Pereles died December 11, 1910, and Thomas J. Pereles was thereafter his executor, and the management of the affairs of the *Trust Company* and of the Kaukauna Company were subject to his direction. The Kaukauna Company never earned interest on the $75,000 of bonds, and the *Trust Company* advanced it until November 1, 1912. It also advanced the money to cover the cost of certain improvements which the company was required to make by order of the railroad commission. So that on July 16th the Kaukauna Company owed the *Trust Company* about $27,000. Upon receipt of the $45,294.40 paid to it by the city on July 11, 1912, the Kaukauna Company, at the direction of Thomas J. Pereles, turned this amount of money over to the *Trust Company* and at his direction subsequently gave the following directions as to payment: (1) Principal and interest of $7,000 of bonds to pay for such improvements; (2) all interest advanced for first mortgage bonds; (3) sum of $1,901.22, expense of management; (4) balance to take up mortgage bonds, principal and interest. In carrying out the

directions of Pereles the *Trust Company* paid principal and interest of $15,500 of the first mortgage bonds in full.

Upon the facts as found and upon the undisputed evidence the court concluded as follows:

"1. That the said proceedings of purchase did not operate, of themselves, to divest the lien of said trust deed or to transfer said plant to the defendant city freed from said lien.

"2. That said bonds and all thereof were void while in the hands of the original holder; but that the said bonds are negotiable instruments under the Negotiable Instrument Law of Wisconsin, and the holders thereof are holders in due course before maturity and hold the same free from defenses available to prior parties among themselves and may enforce payment for the full amount thereof.

"3. That the trustee under said trust deed, by virtue of the terms of the deed and the facts found, had authority to receive the purchase money of said plant as determined by said railroad commission and apply the same or take action to have the same applied upon said bonds for the benefit of the bondholders *pro rata,* and that the receipt of the purchase money by the trustee operated to restrict the trustee and the bondholders to the remedy of impressing said purchase money with the lien of said trust deed and to release the said plant from the lien of said trust deed.

"4. That the plaintiff is barred by laches and estopped from foreclosure of the trust deed by reason of the acquiescence of the bondholders in the position of the city and permitting the city, without objection or notice of adverse claim, to expend so large a sum in betterments after November 1, 1912, when the bondholders received notice of the facts found.

"5. That the notice of the present trustee that he claimed and demanded payment to him of the residue of said $6,500 in the city's hands was an election of remedies, and constituted waiver of right, if any there then was, to foreclose said trust deed, and that plaintiff should be restricted to the remedy then selected, of ratifying the transfer of the said plant by the city and impressing the purchase money with the lien of said trust deed. ·

"6. That the plaintiff is entitled to judgment against the Kaukauna Company for the full amount of the bonds unpaid and interest thereon as found; and that he is also entitled to judgment against the city of *Kaukauna* for payment to him of the said sum of $2,084.85, the said residue in its hands, less the costs and disbursements of the defendant city to be taxed.

"7. That the defendant the city of *Kaukauna* is entitled to judgment upon its counterclaim quieting its title to said plant free and clear from the lien of said trust deed and any and all other claims of the parties hereto; and that the city is entitled to recover its taxable costs and disbursements herein and deduct the same from the residue of the purchase money adjudged to be paid to the plaintiff."

It is also undisputed that at the time of the purchase proceedings and the payment of the money the mayor and the city attorney, who acted for the city, had actual knowledge of the mortgage and its terms and paid the money to the Kaukauna Company at the request of the Pereles firm.

From the judgment entered in accordance with the conclusions of the court plaintiff appeals and alleges that the conclusions of law are erroneous and that the findings and the undisputed evidence do not sustain the judgment.

The cause was argued on May 26, 1916.

For the appellant there were briefs by *Lines, Spooner, Ellis & Quarles,* and oral argument by *George Lines.*

For the respondent *City of Kaukauna* there was a brief by *Geo. G. Greene* and *Jerome R. North,* and oral argument by *Mr. North.*

On June 13, 1916, it was ordered that the parties file additional briefs on the following questions:

1. Were the rights of bondholders in any event impaired by the exchange without their consent of the franchise for an indeterminate permit?

2. Was the trustee empowered by the trust deed to represent the bondholders in the purchase proceedings, or bind

them in any way, by action or nonaction, and if not, could the legislature give him such power without consent of bond-holders?

3. Can the purchase law be sustained as in substance a valid condemnation statute?

Prior to August 15, 1916, additional briefs were filed by the attorneys above named. A brief was also filed by *Charles F. Fawsett, amicus curiæ,* and a reply thereto by *Geo. G. Greene* and *Jerome R. North,* attorneys for the re-spondent city.

The following opinion was filed November 14, 1916:

ROSENBERRY, J.   The fundamental question in this case is: What is the nature and effect of the proceedings taken by the city of *Kaukauna* to acquire the property of the Kau-kauna Company? If the proceeding is purely contractual and is to be governed wholly by the law of contract, one re-sult will follow; if, on the other hand, it is in the nature of a condemnation proceeding, it will be governed by the law of eminent domain and a different result will be reached.   The solution of this question involves an examination of the Pub-lic Utilities Act, under which the proceedings were had.   No collateral questions are presented.

The city of *Kaukauna* is admittedly a municipality, the Kaukauna Company admittedly a public utility, and all the requirements of the law as it then stood were admittedly complied with; so that the sole question presented for solu-tion is: What was the nature and effect of the proceedings had?

The provisions of the law so far as they are material to the solution of this question are as follows:

(1) An indeterminate permit is every grant from the state, to any corporation, of power to own, operate, manage, or control any plant for furnishing heat, light, water, or power to or for the public, which permit shall continue in

force until the municipality shall exercise its option to purchase as provided by this act.    Sub. 5, sec. 1797m—1, Stats. (Laws 1907, ch. 499).

(2) Every license, permit, or franchise hereafter granted to any public utility shall have the effect of an indeterminate permit, subject to the provisions of this act and subject to the provision that the municipality in which the major part of the property is situate may purchase the property of such public utility at any time as provided herein, paying therefor just compensation to be determined by the commission. Any such municipality is authorized to purchase such property and every such public utility is required to sell such property at the value and according to the terms and conditions determined by the commission as herein provided. Sec. 1797m—76 (Laws 1907, ch. 499).

(3) Any public utility being at the time a corporation of the state of Wisconsin operating under an existing franchise shall on surrendering the same prior to January 1, 1911, receive by operation of law in lieu thereof an indeterminate. permit, and shall hold such permit subject to all the terms, conditions, and limitations of this act. Sec. 1797m—77 (Laws 1909, ch. 180).

(4) Any public utility shall by acceptance of any such indeterminate permit be deemed to have consented to a future purchase of its property by the municipality for the compensation and under the terms and conditions determined by the commission, and shall thereby be deemed to have waived the right of requiring the necessity of such taking to be established by the verdict of a jury and to have waived all other remedies and rights relative to condemnation, except such rights and remedies as are provided by this act. Sec. 1797m—78 (Laws 1907, ch. 499).

A municipality may acquire a public utility in one of four ways:

1. Any municipality shall have the power, subject to the provisions of the Public Utilities Act, to construct and operate a plant and equipment or any part thereof.

2. Any municipality shall have the power, subject to the provisions of the Public Utilities Act, to purchase by agreement with any public utility any part of any plant, provided that such purchase and the terms thereof shall be approved by the commission upon hearing.

3. Any municipality shall have the power, subject to the provisions of the Public Utilities Act, to acquire by condemnation the property of any public utility actually used and useful for the convenience of the public then operating under a license, permit, or franchise in existence at the time of the enactment of the Public Utilities Law or operating in any municipality without a permit or franchise.

4. Any municipality shall have the power, subject to the provisions of the Public Utilities Act, to acquire by purchase, in accordance with the provisions of this act, the property of any public utility actually used and useful for the convenience of the public operating under any indeterminate permit as provided by law.   Sec. 1797m—79 (Laws 1907, ch. 499).

In the instant case the city elected to proceed under sub. 4 of sec. 1797m—79.   The proceedings to acquire an existing plant not operating under an indeterminate permit, under the law as it then stood, were as follows: Upon the determination by a municipality by a majority vote of its electors to acquire an existing plant,

"such municipality shall bring an action in the circuit court against the public utility as defendant praying the court for an adjudication as to the necessity of such taking by the municipality, in which action the complaint shall be served with the summons.   The public utility shall serve and file its answer to such complaint within ten days after the service thereof, whereupon such action shall be at issue and stand

ready for trial upon ten days' notice by either party. Unless the parties thereto waive a jury, the question as to the necessity of the taking of such property by the municipality shall be as speedily as possible submitted to a jury." Sec. 1797m—80 (Laws 1909, ch. 213).

Upon the determination of a municipality to acquire an existing plant by a majority vote of its electors, if the public utility owning such plant shall have consented to the taking over of such plant by the municipality by the acceptance of an indeterminate permit as provided herein, or, in case such public utility shall not have waived or consented to such taking, if the jury shall have found that a necessity exists for the taking of such plant, then the municipality shall give speedy notice of such determination and of such consent or such verdict of a jury to the public utility and to the commission. Sec. 1797m—81 (Laws 1909, ch. 213).

The commission shall thereupon, after public hearing and within three months from the receipt of such notice and upon notice to the municipality and the public utility interested, determine and certify the just compensation to be paid, together with all the terms and conditions of sale. Sec. 1797m—82 (Laws 1907, ch. 499).

If either party to the proceeding is dissatisfied with the order, it may commence and prosecute an action to review it. Secs. 1797m—83 to 1797m—85 (Laws 1907, ch. 499).

It will be noted that the only difference between the proceeding under sub. 4 of sec. 1797m—79, which is denominated a proceeding to acquire by purchase as provided under the Public Utilities Act, and the proceeding under sub. 3 of sec. 1797m—79, which is denominated a proceeding to acquire by condemnation, is that in the one case the verdict of a jury as to necessity is required, and in the other it is deemed to have been waived by the fact that the utility has accepted an indeterminate permit.

Under the law, is the acceptance of an indeterminate per-

mit anything more than a waiver by the utility of a verdict of necessity as required by the constitution ?

Sec. 2, art. XI, Const., is as follows: "No municipal corporation shall take private property for public use, against the consent of the owner, without the necessity thereof being first established by the verdict of a jury."

Clearly, if the owner consent, no verdict is required, and thereafter, under the statute, the proceedings are the same under both subdivisions. While the proceeding is denominated a "purchase" by sub. 4, and the relation of the parties is said to be to some extent contractual, it must be conceded that upon the acceptance of an indeterminate permit by a public utility the relationship between the municipality and the public utility is something more than contractual. If it were merely contractual the parties might, by contract, restore themselves to their original position. This they cannot do, the municipality having no power in the premises. The property of a utility by the acceptance of an indeterminate permit acquires a status which cannot be changed except through act of the legislature.

It seems to us that the acceptance of an indeterminate permit by a public utility amounts to this: that a verdict of necessity is thereby perpetually waived and the utility consents that proceedings to acquire its property may be initiated at any time by the municipality and it consents that its property may be acquired in the particular manner prescribed by the act. The municipality acquires the same rights when a verdict of necessity is rendered in proceedings under the act and the utility does not consent, the proceedings in both cases thereafter being identical.

A verdict of necessity may be and often is waived in condemnation proceedings, leaving the amount of compensation to be paid for the property taken the sole question for determination. Such proceedings are, however, condemnation proceedings. The damages are thereafter to be determined

in accordance with the law relating to the exercise of the power of eminent domain and not in accordance with the law of contract.

We conclude, therefore, that the proceeding in this case is in the nature of a condemnation proceeding, and the effect of the proceeding is therefore to be determined in accordance with the laws governing the exercise of the power of eminent domain. In arriving at this determination we have considered the fact that the proceeding is denominated a "purchase" in the act itself, and that in some aspects the rights of the parties are contractual and are thus spoken of in prior decisions of this court.

But it is said that the proceeding cannot be sustained as one in the nature of a condemnation proceeding, because as the law stood at the time there was no provision requiring that notice be given to lienholders, and *Davis v. La C. & M. R. Co.* 12 Wis. 16; *Kennedy v. M. & St. P. R. Co.* 22 Wis. 581; *Wooster v. S. R. V. R. Co.* 57 Wis. 311, 15 N. W. 401; and *Stamnes v. M. & S. L. R. Co.* 131 Wis. 85, 109 N. W. 100, 925, 111 N. W. 62, are cited to our attention as sustaining this proposition. While there is a remark in the *Davis Case* which tends to support the view that a valid condemnation can only be had where the persons interested in the property, including mortgagees, are before the court, a study of all the cases convinces us that what was being dealt with and what was in the mind of the court was the matter of condemnation by railroad companies under special charters or general laws, all of which contain provisions similar to the provisions of secs. 1846 and 1847, which require that notice be given to the owner and to *persons interested in the premises.* We think the decisions in these cases are referable to the statute law and do not decide that there can be no valid condemnation except upon notice to lienholders; especially so in view of the fact that other statutes relating to the exercise of the power of eminent domain which require notice to the

owner only have stood unchallenged for fifty years. Under secs. 605–609 and sub. 9, sec. 1494t—3, Stats., providing for condemnation directly by the state, ten days' notice of the application for commissioners is required to be served upon the owner or given by publication. Five days' notice of the meeting to fix compensation is provided, which may be served personally upon the *owner* or by leaving it at *his* abode. By secs. 694c, 694e, and sub. 3, sec. 1317m—6, Stats., counties may condemn for all county purposes on notice to the *owner only*. Sec. 895, Stats., and subsequent sections authorize villages to exercise the right of eminent domain on notice of the proceedings and meetings to the *owner or occupant*. Secs. 1265, 1266, and 1267, Stats., authorize towns to condemn lands for highway purposes on notice to *all the occupants*. Secs. 1379—3 and 477–484, Stats., authorize condemnation by school districts and for drainage purposes upon notice to the *occupant and owner*. So statutes for taxation provide for *notice to the owner only*. While there is a conflict of authority, there are many cases holding that such statutes are not unconstitutional for failure to require notice to lienholders. *Fitchpatrick v. Botheras,* 150 Iowa, 376, 130 N. W. 163; *Harkins v. Asheville,* 123 N. C. 636, 31 S. E. 853; *Kinnie v. Bare,* 80 Mich. 345, 45 N. W. 345; *Goodrich v. Board of Comm'rs,* 47 Kan. 355, 27 Pac. 1006; *Baldwin v. Moroney,* 173 Ind. 574, 91 N. E. 3; *Eau Claire v. Eau Claire W. Co.* 137 Wis. 517, 533, 119 N. W. 555.

The owner in this case having consented, by the acceptance of an indeterminate permit, that its property be taken, the taking was not against the consent of the owner, and the verdict of a jury as to necessity was not required. Under the facts in this case the question of taking was a legislative one, and the power to make the determination of that question was vested in the electors of the municipality, whose decision was in that respect conclusive.

The consent of the owner to the taking being equivalent to

notice to the owner, the case stands as if the statute required notice to the owner and such notice had been given; and the taking is a valid one although no notice was given or required to be given to lienholders, and for reasons above stated the law is valid.

The property being appropriated by the municipality for public use, the law provided the means by which the amount of compensation to be paid therefor should be fixed, as follows: The commission was required to give notice of a public hearing within three months of the date of the notice of the municipality's determination to take the property, to the municipality and the utility, and upon this public hearing the commission was required to fix the compensation and the terms and conditions of the sale and purchase, which were required to be reasonable. Sec. 1797m—82 (Laws 1907, ch. 499).

Secs. 1797m—83 to 1797m—85 (Laws 1907, ch. 499) provide the method for reviewing the order of the commission by appeal to the circuit court. Sec. 1797m—83 was amended by ch. 662 of the Laws of 1911, in effect July 21, 1911, by the insertion of the italicised words, to read as follows:

"Any public utility or the municipality *or any bondholder, mortgagee, lienor or other creditor of the public utility,* being dissatisfied with such order, may commence and prosecute an action in the circuit court to alter or amend such order or any part thereof, as provided in sections 1797m—64 to 1797m—73, inclusive, and said sections so far as applicable shall apply to such action."

The award of the commission was made December 26, 1911; so that at the time the award was made the law provided a method by which any bondholder might have the order of the commission reviewed. While sec. 1797m—82 did not require notice to any one other than the municipality and the public utility, the hearing was a public one before an

administrative commission and any person having an interest in the subject matter of the hearing might upon application be heard. It is claimed that the public character of the hearing provided for under the law as it stood prior to the amendment of 1911, and the right of review given by sec. 1797m—83 as amended, constitute sufficient notice in an administrative proceeding to bind all bondholders, and *Newton v. Superior,* 146 Wis. 308, 130 N. W. 242, 131 N. W. 986; *Hodge v. Muscatine Co.* 196 U. S. 276, 25 Sup. Ct. 237; and *Nelson v. Waukesha,* 147 Wis. 163, 132 N. W. 887, are cited as sustaining this proposition.

While the determination in such a proceeding is of such a public character that every one affected by it may be chargeable with notice of it, we do not find it necessary to rest the decision in this case upon that ground.

It appears that in accordance with the statute as it stood prior to the amendment formal notice was given to the municipality and to the Kaukauna Company, but that no formal notice was given to the *Trust Company.* It does appear, however, that the officers of the *Trust Company* had actual notice of the proceeding. Thomas J. Pereles, at that time the president and managing officer of the *Trust Company,* and the owner or in control of practically all of the capital stock of the Kaukauna Company, directed that an appeal be prosecuted from the order of the commission. The attorneys who appeared at his direction and prosecuted the appeal entered their appearance in behalf of the Kaukauna Company, although at the time he was not an officer of the Kaukauna Company. It must be remembered that under the facts in this case there was but one interest, the Pereles firm, which was represented by the Kaukauna Company and the *Trust Company.* They owned all but one share of the capital stock of the Kaukauna Company and 2,560 shares of the 3,000 shares of the capital stock of the *Trust Company.* Each of these concerns derived all of its authority from one

common source and they were all subject to the management and control of Thomas J. Pereles, and were all carried on for the benefit of and in the interest of the Pereles firm. It would be nonsense for us to say that the *Trust Company* had no notice of the proceedings to fix the compensation, when its managing officer who owned it was engaged in the prosecution of an appeal in the proceeding and from which the *Trust Company,* and through the *Trust Company* the bondholders, derived every benefit that could have been derived had the appearance of the attorneys employed by him been made in the name of two of his companies instead of one.

The case might be very different if the Kaukauna Company and the *Trust Company* were in fact separate in interest and were managed and controlled and owned by different persons. It does not appear that any bondholder had actual notice of the condemnation proceedings. However, upon the whole record we must hold that the trustee, and through the trustee the bondholders, are bound by the judgment of the circuit court affirming the award of the commission. Formal notice to the trustee would have been sufficient under all the authorities to bind the bondholders claiming under the trust deed. *Iowa Co. v. M. P. R. Co.* 24 Wis. 93; *Swift v. State L. Co.* 71 Wis. 476, 37 N. W. 441; *Vetterlein v. Barnes,* 124 U. S. 169, 8 Sup. Ct. 441.

The amount awarded as just compensation for the property of the Kaukauna Company was $50,000, and the award was affirmed November 21, 1914, by judgment of the circuit court. It being established that the trustee and the bondholders are concluded by the award, we come now to the distribution of the proceeds of the award, a difficult and disagreeable question. This court has well said:

"When one enjoying the confidence of the community in which he has acted as intermediary between investors and borrowers of money proves to have been both dishonest and insolvent, complications arise of the most serious character, in which the attempt to do justice must, of necessity, be pain-

ful to the courts; for, whatever the result, one party or the other—and often both—must suffer injury; sometimes ruin. The strain upon the human sympathies is frequently such as to render difficult adherence to settled rules of law, which, in individual cases, may seem to cast the burden of the wrong on him who can least well bear it. Such rules, however, become established upon many and varied considerations as likely, in the long run, to approximate most nearly to justice, and to minimize the wrong as far as possible, and must be applied by a court until, if the desired results are not obtained, the lawmaking power shall readjust them." *Loizeaux v. Fremder,* 123 Wis. 193, 197, 101 N. W. 423.

Whatever our personal inclinations may be, our duty is clear; it is to hew to the line, let the chips fall where they may; to apply the law to the facts as they appear, let the result be what it may. In this case it appears without dispute that the amount of bonds outstanding at the time the award was made was $75,000, and there was retained by the city out of the award of $50,000 the sum of $6,500, out of which a first lien on the property was to be liquidated, there being at the time a dispute as to its validity, it afterward being decreed a valid lien. *Green Bay & M. C. Co. v. Kaukauna G., E. L. & P. Co.* 157 Wis. 412, 147 N. W. 701. After the payment of the first lien out of the $6,500, the sum of $2,084.85 remained and still remains available. On July 11, 1912, the city paid to the Kaukauna Company $45,294.40, being the remainder of the award plus accrued interest to date after deducting $6,500. The Kaukauna Company in turn paid it to the *Trust Company,* which held it for some days and then, upon direction given by the Pereles firm through the Kaukauna Company, disbursed it in a certain specified way, and of the amount disbursed approximately $15,500 was paid the bondholders.

The trial court concluded as a matter of law that the *Trust Company* had under the terms of the trust deed "authority to receive the purchase money of the said plant as determined by the said railroad commission and apply the same or take

action to have the same applied upon said bonds for the bene-
fit of the bondholders *pro rata,* and that the receipt of the
purchase money by the trustee operated to restrict the trustee
to the remedy of impressing said purchase money with the
lien of said trust deed and to release the said plant from the
lien of said trust deed." Or, in effect, that the payment to
the *Trust Company* was in fact a payment to the bondholders
and that thereafter the bondholders had no remedy except-
ing a personal claim against the trustee.

Appellant contends that this conclusion is erroneous. The
trust deed was in the usual form of such instruments, and
from the decision of the trial court it appears that the court
based its conclusions upon article VI of the trust deed, which
is as follows:

"In case default shall be made in the payment of any in-
stalment of interest on any of the bonds issued hereunder,
then and thereupon the principal of all the bonds secured by
the mortgage shall, at the election of the trustee, become im-
mediately due and payable; or in case any proceedings or ac-
tion or any other steps be commenced or instituted for the
foreclosure or enforcement of any second or subsequent mort-
gage by said company, against said property, or any portion
thereof, then and thereupon the principal of all the bonds se-
cured by this mortgage shall become immediately due and
payable without notice."

It appears without dispute that the instalment of interest
due May 1, 1912, was advanced by the *Trust Company* and
paid to the bondholders without knowledge on their part as
to its source. The trial court says:

"Obviously the *Trust Company* did not make the payment
of interest to the bondholders on May 1st in good faith, and
could not have so made any interest payment after the pro-
ceedings for purchase were instituted by the city. It ob-
viously advanced the interest at these times, particularly on
May 1st, with a view of postponing the discovery by its cus-
tomers, the bondholders, of its breach of faith with and duty

to them, in foisting upon them discredited and unsound securities, instead of the safe and interest-paying securities which it had been charged to procure with the funds left with it for investment. Under these circumstances it appears to me that there had in fact been a default of the Kaukauna Company in paying interest on the bonds in suit, although there had been none in form. The situation was such that the trustee would have been entirely justified on May 1, 1912, and at either interest-paying time in 1911, in exercising its option to declare the principal of the bonds due for default of payment of interest, which it had the authority to do under article VI of the trust deed."

There can be no question but that the trial court was right in holding that the trustee would have been justified in declaring the whole amount secured by the trust deed due, instead of advancing the funds for the payment of the amount due. But the trustee did not exercise this option; on the contrary, it advanced the money with which to pay the interest due. Certainly after such interest was paid there was no default, and there existed at no time before November 1, 1912, such a default as would authorize the trustee to act under the provisions of article VI. After the *Trust Company* had paid the interest it could not by any action on its part withdraw payment and create a default. It cannot be held that it was unlawful for the *Trust Company* to advance this money for the Kaukauna Company, although it may well be true, as the court found, that its main purpose in doing so was to conceal from its customers the true situation. Whatever might have been done, the interest was in fact paid. The conclusion reached by the trial court, therefore, that the *Trust Company* might have declared the whole of the bonds, principal and interest, due, and that it was therefore authorized to accept payment, does not follow. In any event, no sum would be due except the amount as to which there was a default until the trustee had in fact elected to declare the same due in accordance with the provisions of article VI.

The power therein was never exercised, and consequently the covenants contained in article VI did not operate and could not operate until such election was in fact made.

The payment to the trustee not being authorized by the terms of the trust deed, it is clear that it had no authority to receive payment for the bondholders merely because it was trustee. It is true that the coupons and bonds were payable at the office of the *Trust Company,* but they were so payable only when due. The fact that the bonds and interest coupons were made payable at the office of the *Trust Company* did not make the *Trust Company* the agent of the bondholders to receive payment. Money deposited with the *Trust Company* for that reason remained the property of the payor, and if lost it was the loss of the payor. *Bartel v. Brown,* 104 Wis. 493, 80 N. W. 801.

It is the established law of this state that payment of a negotiable instrument must be made to the party having possession of the same or to some person duly authorized by the payee to accept payment, and that where the person to whom payment is made is not in possession of the negotiable instrument the burden is upon the party making the payment to show the agent's authority by clear and satisfactory evidence. *Bartel v. Brown, supra; Spence v. Pieper,* 107 Wis. 453, 83 N. W. 660; *Loizeaux v. Fremder,* 123 Wis. 193, 101 N. W. 423; *Marling v. Nommensen,* 127 Wis. 363, 106 N. W. 844; *Drake v. Drake,* 142 Wis. 602, 126 N. W. 19.

The authority of the trustee to act for the bondholders is prescribed and limited by the terms of the trust deed, and a payment to the trustee merely as trustee cannot be held to be payment to the bondholders, unless made when and as prescribed by the terms of the deed. *Miller v. Mitchell,* 58 W. Va. 431, 52 S. E. 478; *Kransz v. Uedelhofen,* 193 Ill. 477, 62 N. E. 239; *Fortune v. Stockton,* 182 Ill. 454, 55 N. E. 367; *Schroeder v. Wolf,* 227 Ill. 133, 81 N. E. 13.

It appears without dispute that the city, through its offi-

cers who had charge of the matter, not only had constructive notice .afforded by the record, but had actual notice of the terms and conditions of the trust deed.    It is the established law of this state that the lien of a mortgage extends to the award.    *Stamnes v. M. & S. L. R. Co.* 131 Wis. 85, 109 N. W. 100, 925, 111 N. W. 62.    Such being the case, it was clearly the duty of the city to see that the amount of the award, which was admittedly less than the amount 'of bonds outstanding, was applied in some manner to the satisfaction of the claims of the bondholders.    It might have accomplished this purpose in one of two ways: (1) By payment of the money into court for distribution.    (2) By securing consent of the bondholders, or, in the event that they would not consent to accept payment, waiting until they asserted their rights in the fund.    The city could not discharge its obligation in this respect by turning over the amount of the award to the insolvent Kaukauna Company to be disposed of at the direction of the Pereles firm.

At this point, as elsewhere during the course of the proceedings, the Pereles interests took the case in hand in their own behalf and in disregard of their duty to the city as well as to their clients.    It appears, however, without dispute that the entire amount of $45,294.40 was paid to the *Trust Company* by the Kaukauna Company.    It also appears that the Pereles brothers, either personally or as managing officers of the *Trust Company,* represented certain of the bondholders as their general agents for investment purposes, with power to accept payment on outstanding securities, to substitute one security for another, and generally to control the investment of the funds of such clients, and, in some cases at least, had the bonds of their clients in their possession.    Therefore when this fund reached the hands of the *Trust Company* it was as to some bondholders in the hands of a general agent, authorized, not by the terms of the trust deed, but by the direction of these bondholders, to deal generally with their

securities and to accept payment, and we must hold that in such cases payment was made.

As to those bondholders who had not constituted the *Trust Company* or the Pereles interests their general agents for the purpose of dealing with their funds and securities and who retained possession of their own securities and managed and controlled them themselves, it is clear that the fund was not in the hands of one authorized to receive payment, and consequently as to such bondholders there was no payment.

The trust deed was for the *pro rata* benefit of all of the bondholders, and upon the making of the award and the ascertainment of the first lien thereon—now established by decree of the court—each bondholder became entitled to receive his *pro rata* share thereof. The court did not find the facts relating to the authority of the *Trust Company* to represent the several bondholders. Further proceedings in that respect are therefore necessary. Neither does it definitely appear to what bondholders the $15,500 was paid.

The trial court held that the trustee was restricted from pursuing any other remedy than that "of impressing said purchase money with the lien of the trust deed." If payment to the *Trust Company* was not a sufficient impressment, it is difficult to understand how the *Trust Company* could impress funds in its own hands. The holding in effect amounts to this: that the plaintiff trustee has no other remedy than to pursue the funds in the hands of the *Trust Company*. This proposition rests primarily upon the conclusion that the *Trust Company* was authorized to accept payment. The *Trust Company* not being so authorized, the conclusion of course does not follow.

It appears that the plaintiff trustee demanded payment to him of the amount remaining in the hands of a third party after the satisfaction of the first lien, being the $2,084.85 hereinbefore referred to. In making this demand the trustee was acting under the trust deed, having been duly authorized

to so act in accordance with its terms. He had a perfect right to demand and receive the sum due, and, if it amounted to a ratification of the sale to the city, it amounted to no more than acquiescing in the result of a proceeding by which he was already bound. It cannot therefore be held to be an election of remedies nor a waiver of any other rights which he might assert as the representative of the bondholders, whose claim to the award has not been satisfied.

It was further held that the plaintiff trustee was barred by laches and estopped from claiming a foreclosure of the trust deed by reason of the acquiescence of the bondholders in the position of the city and permitting the city without objection or notice of adverse claim to expend a large amount in betterments after November 1, 1912, when the bondholders had notice of the facts by reason of the default in the payment of interest.

In our view of the case there was no estoppel or waiver. The amount of the award in this case was paid some months before there was any default in the payment of interest and at a time when the bondholders had no actual notice of the proceedings. The bondholders had a right to stand upon the terms of the trust deed, and could not be required to accept the amount of the award except in accordance with its terms, unless and until they chose to do so, and it was the duty of the city to preserve the fund until that time for their benefit or to pay it into court.

The bondholders not represented by the Pereles firm or the *Trust Company* are entitled to a foreclosure decree, unless their claims as determined in this action shall be paid by the city. The city being charged with the duty of seeing that the *pro rata* amount of the award was applied to the extinguishment of their claims, and having failed in that duty, and their claims not having been so extinguished, the property may be charged equitably with its payment, the amount, however, being limited to their *pro rata* share of the award.

While there are authorities holding that a payment of an award in condemnation proceedings to the mortgagor is sufficient, we do not think such holding is based upon sound reasoning. Here the bondholders were in fact the equitable owners of the property to the full amount of the award, and to hold that their claims can be discharged by turning over the amount of the award to an insolvent mortgagor or to a trustee not authorized to receive payment, seems to us contrary to the plainest principles of law and justice. An obligation to one person cannot be discharged by a payment to a third person not authorized to receive payment. Neither are there any grounds upon which the bondholders or the plaintiff trustee can be held to be estopped to assert the right of those bondholders not represented by the Pereles firm or the *Trust Company*. The city has never changed its position one iota since November 1, 1912, when there was a default in the payment of the interest on the bonds, or since a time when the bondholders had actual notice of the proceedings. In order to constitute estoppel or waiver the party claiming the benefit thereof must in some way have altered his position for the worse relying upon the conduct of the opposite party. That element of estoppel or waiver is entirely lacking in this case. Although it had notice, actual and constructive, of the trust deed and its terms, the city chose to proceed without regard thereto; no doubt relying, as many others did, upon the responsibility and character of the Pereles firm. However, having trusted them with the property of others, in violation of its duty, it certainly is not in a position to claim that those who did not trust them should bear the loss.

We therefore conclude (1) that the proceedings by which the city acquired title to the property are valid; (2) that the interest of the bondholders was limited to the amount of the award made by the commission as affirmed by the circuit court, less the amount of the first lien for rentals; (3) that the *Trust Company* or the Pereles firm were general agents of some of the bondholders with authority to accept payment

of their bonds, and that as to such bondholders a payment to the *Trust Company* was a payment of their share of the award, to the extent of their *pro rata* share of the sum paid; (4) that as to those bondholders who had not authorized the *Trust Company* or the Pereles firm to represent them, the *Trust Company* had no authority to accept payment and the payment to the *Trust Company* did not affect the right of such bondholders to their *pro rata* share of the award; (5) that all bondholders are entitled to their *pro rata* share of the $2,084.85, except those, if any there are, to whom their full *pro rata* share has been paid; (6) that there should be an accounting and judgment of the trial court determining what bondholders were represented by the Pereles firm or the *Trust Company* as general agents, and what bondholders were not so represented, and establishing the amounts due the several bondholders in accordance with this opinion; (7) that when the facts are so ascertained the city be given a reasonable time within which to liquidate the claims of the bondholders so established; (8) that in the event of the failure of the city to liquidate the claims of bondholders within the time fixed, a foreclosure be had as demanded in the complaint; (9) that the bondholders are entitled to personal judgment against the Kaukauna Company for any amount remaining unpaid after application of the amount of the award as herein directed.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings in accordance with this opinion.

ESCHWEILER, J., took no part.

The respondent *City of Kaukauna* moved for a rehearing. The following opinion was filed January 16, 1917:

ROSENBERRY, J.   It is suggested that the third provision of the mandate, when taken in connection with the statements made in the body of the opinion, is ambiguous.   It

was not intended to adjudicate that the Pereles brothers or the *Trust Company* had authority from any particular bondholder to receive his share of the award, but only to state that the proofs in the record indicate that the Pereles brothers or the *Trust Company* as to some of the bondholders may have had such authority and as to others it did not have such authority, leaving the entire question open for determination by the trial court in accordance with the opinion of this court.

*By the Court.*—Motion for rehearing denied, with $25 costs.